# EXHIBIT B

Brent W. Johnson (Attorney Bar Code 4955745)
Benjamin D. Brown (*pro hac vice forthcoming*)
Daniel McCuaig (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
bbrown@cohenmilstein.com
bjohnson@cohenmilstein.com
dmccuaig@cohenmilstein.com

*Additional Attorneys on Signature Page*

*Attorneys for Plaintiff All Wrapped Up Signs and
Graphix LLC and the Proposed Class*

Christopher J. Bateman (Attorney Bar Code 3037)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine St. ● Fourteenth Floor
New York, NY 10005
(212) 838-7797
cbateman@cohenmilstein.com

Manuel J. Dominguez (*pro hac vice forthcoming*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
11780 U.S Highway One ● Suite N500
Palm Beach Gardens, FL 33410
(561) 515-2604
jdominguez@cohenmilstein.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALL WRAPPED UP SIGNS AND GRAPHIX LLC,<br>1246 Arrowhead Point Road<br>Loxahatchee, FL 33470,<br>on behalf of itself and others similarly situated<br><br>     Plaintiff,<br><br>  vs.<br><br>VISA INC.,<br>One Market Plaza<br>San Francisco, CA 94105<br><br>     Defendant. | Case No:  24-cv-7435<br><br>**CLASS ACTION COMPLAINT** |

## Table of Contents

I.      INTRODUCTION ..................................................................................................... 1

II.     NATURE OF THE CASE .......................................................................................... 2

III.    JURISDICTION, VENUE, AND COMMERCE ....................................................... 8

IV.     PARTIES ................................................................................................................... 9

V.      DEBIT TRANSACTIONS ...................................................................................... 10

        a.      Debit Transactions Overview ..................................................................... 11

        b.      Debit Networks ........................................................................................... 15

                i.      Issuers Determine Debit Cards' Enabled Networks ....................... 15

                ii.     How Debit Networks Make Revenue .............................................. 16

                iii.    Visa Used the U.S. Debit Network's Evolution to Obtain Dominance ........ 17

                iv.     PIN Networks Cannot Meaningfully Compete for Debit Transactions ....... 20

                v.      Alternative Debit Networks ............................................................ 22

VI.     VISA USES EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT TO
        DOMINATE DEBIT TRANSACTIONS IN THE UNITED STATES ......................... 23

        a.      Visa Has Long Been the Largest, Most Powerful Debit Network ...................... 23

        b.      Visa Entered into Contracts with Merchants, Acquirers, and Issuers to
                Hinder PIN Networks ................................................................................. 24

                i.      Visa Imposes Contracts on Merchants and Acquirers That Unlawfully
                        Inhibit Competition ......................................................................... 26

                ii.     Visa Imposes Contracts on Issuers That Unlawfully Inhibit Competition .... 31

                iii.    Visa Took Successful Steps to Entrench its Monopoly Position in
                        Response to the Durbin Amendment ............................................... 33

                iv.     Visa Wields its Monopoly Position to Prevent Would-Be Competitors
                        from Gaining a Meaningful Market Share ....................................... 34

        c.      Visa Wields Its Monopoly Position to Coopt Innovative Network
                Alternatives and Prevent Them from Competing ........................................ 37

i

i.    Visa Recognizes that Fintech Alternatives Threaten to Disintermediate Its Debit Network ............................................................................ 39

ii.    Visa Used Its Monopoly Position to Prevent Staged Wallets Such as PayPal from Disrupting the Debit Market .......................................... 41

iii.   Visa Uses Its Monopoly Profits to Pay off Potential Competitors and Extract Commitments Not to Compete ............................................... 44

VII.    ANTICOMPETITIVE EFFECTS ............................................................... 46

VIII.   NO COUNTERVAILING FACTORS ......................................................... 49

IX.     RELEVANT DEBIT MARKETS ............................................................... 49

        a.    The United States as a Relevant Geographic Market .......................... 50

        b.    Relevant Product Markets ................................................................ 50

              i.    General-Purpose Debit Network Services as a Relevant Product Market..... 50

              ii.   General-Purpose Card-Not-Present Debit Network Services as a Relevant Product Market .......................................................................... 53

X.      VISA HAS MONOPOLY POWER IN THE U.S. DEBIT MARKETS.......................... 54

XI.     CLASS ALLEGATIONS ......................................................................... 57

XII.    CONTINUING VIOLATION .................................................................... 60

XIII.   CAUSES OF ACTION .......................................................................... 60

XIV.    PRAYER FOR RELIEF ......................................................................... 135

XV.     JURY DEMAND ................................................................................ 135

ii

Plaintiff, on its own behalf and on behalf of all those similarly situated, alleges as follows:

I.    **INTRODUCTION**

1.    Merchants across the United States, like Plaintiff All Wrapped Up Signs and Graphix LLC ("All Wrapped Up"), rely on their ability to process debit transactions to run their businesses. Americans use debit cards to make purchases valued over $4 trillion every year. Without the ability to process those debit card transactions, merchants cannot survive. But most merchants have little knowledge about the networks on which debit transactions are processed. Those networks, it turns out, are critical to merchants' businesses and livelihoods. Most importantly, debit networks impose fees on merchants through banks to process debit card transactions. Those fees are a major cost merchants must incur.

2.    Visa dominates the debit network market, and it has engaged in unlawful conduct that has artificially raised the price of those fees beyond what they would be in a more competitive market. Visa has monopolized the debit network on which debit card transactions run. It has entered into agreements to punish businesses that seek to use alternative networks or methods to process debit transactions. And it has entered into contracts to pay off potential competitors so that they do not build new products or networks that would threaten Visa's debit network dominance.

3.    Visa engages in this anticompetitive conduct to protect its massive debit network business. Visa controls the network that connects consumers' banks and merchants' banks to facilitate debit card payments. More than 60% of debit transactions each year run on Visa's debit network, and Visa charges over $7 billion in fees each year to process those transactions. In the United States, Visa earns more in revenue from its debit business than its credit business. And Visa reaps sky-high profits from dominating the debit network, enjoying *83% operating margins*.

1

4.      Visa's anticompetitive conduct harms merchants like Plaintiff and members of the Class. It ensures that Visa continues to dominate the debit network market in the United States without having to meaningfully compete on the price of its fees, driving up costs for small and large businesses alike. And it prevents merchants like Plaintiff from having meaningful alternatives to process debit transactions. That's in part because Visa ensures that merchants cannot divert a significant portion of their debit transactions from Visa to lower-cost alternatives without facing substantially higher fees from Visa. And it's because Visa has stifled innovation throughout the debit network by paying would-be competitors, like fintech companies, to forego developing competing projects in exchange for up to hundreds of millions of dollars from Visa. Visa prevents actual and would-be competitors from gaining the volume and scale necessary to meaningfully compete with Visa. Because of Visa's anticompetitive conduct, merchants are stuck with Visa and its supracompetitive fees.

5.      While merchants suffer, Visa profits. Visa collects more from every debit transaction that is run over its network than it would under competition. Visa's internal documents show that it is aware that, if faced with real competition, it would lose volume to competitors and have to lower its fees, or be displaced altogether with a newer, cheaper alternative. So, Visa has resorted to unlawful, anticompetitive means to maintain its monopoly and its supracompetitive profits.

6.      Plaintiff brings this case on behalf of itself and those similarly situated to stop Visa's unlawful conduct, redress past harms, and restore competition to the debit network market.

## II.    NATURE OF THE CASE

7.      Billions of times every year, merchants throughout the United States like Plaintiff All Wrapped Up accept debit transactions to process their customers' payments. Merchants accept

2

debit cards for purchases at their physical stores (card-present or CP transactions) and online (card-not-present or CNP transactions). In recent years, debit card transactions have taken up more and more of the payments merchants accept from customers.

8.      Multiple parties are involved in debit transactions. There is, of course, the customer who uses a debit card to pay and the merchant that accepts debit cards as payment. There is also the customer's bank, from whom funds are withdrawn to cover the payment. And there is the merchant's bank, to whom the payment is eventually deposited. For the transaction to work, the customer's bank and the merchant's bank must be able to connect—otherwise, the funds from the customer's bank will never make it to the merchant's bank. This means that, for debit transactions to function throughout the United States, thousands of consumers' banks must be able to communicate with all of the merchants' banks. The processes that connect the banks and ensure transactions can be completed are known as debit networks.

9.      Debit networks can process a transaction only if the bank that issued the debit card to the consumer (the issuing bank or issuer) and the merchant's bank that receives the payment (the acquiring bank or acquirer) are part of the network. That's because a network can process a transaction only if it can connect the issuing bank to the acquiring bank to transfer the customer's funds. It is not a given that a network will be able to connect the banks. Issuing banks decide which networks they will place on their debit cards. Separately, merchants and acquirers decide which networks they will accept to process debit transactions. For a network to compete for a transaction, the transaction must be made on a debit card that uses a debit network that is accepted by the merchant and its acquirer.

10.     Debit networks thus face a chicken-and-egg problem. A debit network can be successful only if many issuers put the network on their debit cards and many acquirers accept it.

3

Issuers, however, are likely to place debit networks on their cards only if many merchants and their acquiring banks already accept the networks. On the flip side, merchants and acquirers are likely to join debit networks only if their customers already have cards that use them. In other words, issuers are likely to join a network only if acquirers already use the network, and acquirers are likely to join a network only if issuers already use it. This makes achieving scale on both sides of the market with consumers and issuers on the one hand and merchants and acquirers on the other exceptionally difficult. Visa, which is already entrenched with both issuers and acquirers, knows that its position protects its business by preventing competitors from achieving the scale that it already has.

11.     Without that scale, Visa's competitors cannot meaningfully compete. For decades, Visa has been the largest debit network in the United States. Visa's network runs over 60% of all debit transactions in the United States. And Visa's network runs even more of card-not-present debit transactions: over 65%. Mastercard, the next largest network, processes less than 25% of all debit transactions and card-not-present debit transactions in the United States. The other debit networks in the United States—known as PIN networks because they started out facilitating ATM transactions that required entering a PIN—have much smaller market shares.

12.     Visa's dominant market shares of debit transactions and card-not-present debit transactions are no accident. Following the Great Recession, Visa observed two significant threats to its monopoly. First, Congress passed the Durbin Amendment as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). The Durbin Amendment mandated that issuing banks include at least two unaffiliated debit networks on every debit card. The front side of a debit card includes a debit network that can be used to process transactions (front-of-card networks). The back side of a debit card then lists

4

additional debit networks that can also be used to process transactions for that card (back-of-card networks). For the first time, the Durbin Amendment required that every debit card include at least two debit networks—one front-of-card network and at least one back-of-card network—and that those networks be unaffiliated with each other. The purpose of the Amendment was to promote competition in the debit industry by providing merchants more networks from which they could choose to process their debit transactions.

13.    Visa, however, saw the Durbin Amendment as a threat to its entrenched market share. If banks connected more debit cards to debit networks other than Visa, Visa determined it could create a tipping point after which smaller debit networks would gain the scale needed to compete with Visa. Visa was right to be concerned: in 2012, after the Amendment went into effect, Visa lost volume to other debit networks that offered lower fees. This trend, if continued, would have dislodged Visa from its dominant position in the debit market.

14.    Instead, Visa leveraged its dominant position to limit competition and maintain its market power. Visa knows that it faces no competition for any debit transaction that it owns (non-contestable transactions). As described *infra*, for these transactions, Visa is the *only* network available to the merchant and the issuer. As a result, Visa does not face any meaningful competition on those transactions. It can therefore threaten merchants and acquirers with high rates that they would have to accept to be able to process those transactions.

15.    For contestable transactions, however, merchants can theoretically choose between Visa and the other debit networks authorized by the issuing bank. In a competitive market, this could create competition between Visa and those alternative debit networks, leading to lower fees and additional innovation.

16.     Because of its non-contestable transactions, though, Visa can prevent the market from actually being competitive. Merchants have to be able to process their customer's non-contestable transactions. The only way to process those non-contestable transactions is to use Visa's debit network. Visa then uses its control of those non-contestable transactions to limit competition for *contestable* ones. It does so by extracting routing deals. Without a routing deal, merchants pay the rack rate, or list price, on each Visa debit transaction. With a routing deal, however, the merchant (or its acquirer) signs an agreement with Visa to receive a discount on all Visa transactions in exchange for committing to route a huge portion of its debit transactions through Visa. Put another way, Visa threatens punitive, high rack rates if merchants route a meaningful share of their transactions to Visa's competitors. So, if merchants (or their acquirers) refuse to sign routing deals, the merchants suffer from paying high rates on the non-contestable transactions that they *have* to send through Visa. Merchants or their acquirers are thus left with little choice but to sign routing deals sending most of their transactions to Visa. As a result, other debit networks cannot compete for those transactions, and cannot grow their market share.

17.     Visa understood this. It has determined that its routing deals allow it to stabilize volume by ensuring that a huge number of transactions have to be routed over Visa's network. Those routing deals cover over 180 of Visa's largest merchants and acquirers. They therefore insulate at least *75%* of Visa's debit volume from competition. This equates to Visa foreclosing nearly half of all U.S. debit volume.

18.     Visa emphasizes internally that its routing deals limit competition. And it renewed many of them in 2022, entrenching its dominance of the debit market for years to come.

19.     Beyond working around the goals of the Durbin Amendment, Visa has taken further steps to protect itself from competition, including from fintech companies. Visa knows that new

6

innovations could allow consumers to make debit purchases in new ways and strip Visa of its control of debit transactions. Indeed, numerous digital platforms, including Apple, PayPal, and Square, already have large networks that connect merchants and consumers and offer products consumers can use to pay those merchants. Through these products, consumers can link their debit card credentials to Apple Pay, PayPal, Cash App, or other payment products. This allows purchases to be made in convenient and efficient ways.

20.     Given these companies' payment innovations, Visa worried that they might have network ambitions—meaning that Apple, PayPal, Square, or similar companies could try to eliminate Visa and other debit networks as links between consumers and merchants (and issuers and acquirers). For this reason, Visa viewed Apple Pay as a substantial threat to its debit business.

21.     To disarm that threat, Visa makes deals with emerging players before they disrupt Visa's debit network business to prevent competition. For instance, Visa agrees to provide incentives, sometimes to the tune of hundreds of millions of dollars annually, to these potential competitors in exchange for an express agreement that they will not develop a competing debit product or threaten Visa's dominance in the debit market. And where these incentives are not enough, Visa threatens additional fees on these competitors if they develop competing debit products.

22.     Visa's anticompetitive conduct has harmed competition in relevant debit markets. First, Visa exercises its monopoly power in the debit markets to deprive its rivals of scale that would allow them to compete with Visa on a level playing field. Because Visa-branded cards comprise a substantial portion of all U.S. debit cards and merchants must use Visa's network for a large proportion of non-contestable transactions, Visa can engage in the above anticompetitive conduct without losing merchants.

7

23.    Second, Visa's conduct forecloses competition in a substantial portion of the relevant debit markets, including at least 45% of all U.S. debit transactions and over 55% of card-not-present transactions. Foreclosing competition in these markets prevents smaller rivals from gaining scale, which is needed to compete on price and quality in the two-sided market of debit transactions because a network must be carried by both the merchant/acquirer *and* the issuer to own a transaction. If a network cannot gain scale with either acquirers or issuers, it cannot meaningfully compete in the debit transaction market. So, Visa's separate agreements with issuers and with merchants/acquirers prevent competitors from gaining scale and competing. Unsurprisingly, debit networks not owned by Visa and Mastercard make up only around 11% of all debit transactions and about 5% of card-not-present debit transactions today.

24.    Third, Visa's confirmed commitments from several large, potential competitors not to release products that would threaten Visa's debit market dominance further harm competition. These agreements, including with Apple, PayPal, and Square, turn potential competitors into partners, drastically limiting competition and Visa's incentive to innovate. This harms American merchants and consumers. As a result of its entrenched position as the dominant digital middleman for debit transactions, Visa enjoys outsized profit margins from high fees that it would not maintain under competition. American merchants pay much of those fees. In the short and long run, those merchants, along with the broader economy, are harmed by the higher fees and lack of innovation that result from Visa's anticompetitive conduct.

25.    Plaintiff brings this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and pursuant to various state laws to put a stop to Visa's exclusionary and anticompetitive schemes and remedy the harm Visa has caused. Plaintiffs seek damages in excess of $5 million.

## III.    JURISDICTION, VENUE, AND COMMERCE

26.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the class; and at least one member of the class is a citizen of a state different from that of the Defendant.

27.    The Court also has jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. Plaintiff seeks to recover overcharges and treble damages for injuries sustained by Plaintiff and the Class resulting from Visa's anticompetitive conduct and foreclosure of competition in the relevant markets that maintained and enhanced Defendant's dominant position and monopoly power. Given that Plaintiff seeks relief for these violations of the Clayton Act and the Sherman Antitrust Act, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court possesses supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

28.    Venue is proper in this Court pursuant to, among other statutes, § 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because Visa regularly transacts business within this District, is found within this District, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

## IV.    PARTIES

29.    Plaintiff All Wrapped Up Signs and Graphix, LLC, is a limited liability corporation in Florida located in Palm Beach County, Florida that has been in business since May 24, 2022. All Wrapped Up Signs and Graphix, LLC is an advertising and marketing company specializing

9

in vehicle wraps, custom designs, solar film paint protection and architectural films. All Wrapped Up Signs and Graphix, LLC accepts general purpose debit cards that run on Visa's debit network.

30.    Defendant Visa, Inc. ("Visa") is a Delaware company with its principal place of business in San Francisco, California. Visa, Inc. owns and operates the Visa debit network, the largest debit network in the United States. Last year, it routed 57.6 billion debit transactions worth $2.8 trillion. Visa provides a two-sided transactions platform that processes debit transactions between businesses, consumers, and banks through authorization, clearance, and settlement. In fiscal year 2023, Visa reported revenues of approximately $32.7 billion, including $14 billion in the United States. Visa engages in interstate trade and commerce, and its activities substantially affect trade and commerce. Visa's services are marketed, distributed, and offered throughout the United States, including across state lines and in this District.

## V.    DEBIT TRANSACTIONS

31.    Most consumer-facing merchants in the United States accept debit card transactions, and the mechanics of how those transactions work are critical to Visa's anticompetitive conduct. Debit transactions are a financial transaction through which funds are drawn from a consumer's bank account and deposited in a merchant's bank account to pay for goods or services. In today's market, consumers can use debit cards in different ways, including buying goods at a physical retailer or making payments online.

32.    Debit cards sprang into existence in the United States in the 1960s, as banks came up with new ways for their customers to access bank account funds. At that time, customers could withdraw funds from their bank accounts by using a debit card issued by their bank at an automated teller machine (ATM). As time went on, some debit cards could be used to make payments at retail stores. In the 1990s, retail merchants began accepting debit cards in much larger numbers, and more consumers began using debit cards. From then on, debit cards became increasingly popular

with consumers because of their convenience and security, and retail merchants accepted them more and more.

33.    Debit cards are now a widely used and popular method of payment in the U.S. economy. Tens of millions of Americans use, and the merchants they shop at accept, debit cards for online and in-person purchases. Debit cards generally do not offer rewards like credit cards. Consumers who prefer debit cards are thus often those who, for a variety of reasons, do not want to use or cannot obtain credit cards.

### a.    Debit Transactions Overview

34.    Merchants accept debit as one way for consumers to purchase their goods and services using a number tied directly to their bank account. Debit transactions are processed using debit networks, the infrastructure that allows for secure, real-time payment transactions between the bank accounts of businesses, merchants, and consumers.

35.    The most common way consumers make, and merchants accept, debit purchases in the United States is by using a general purpose debit card, issued by the consumers' bank. In this context, general purpose means that several unrelated merchants will accept the card.

36.    Visa and other debit networks do not issue general purpose debit cards directly to consumers. Rather, debit networks like Visa agree with the consumers' bank (the issuing bank or issuer[1]) to create and issue the debit cards. Debit networks like Visa then also contract with the

---

[1] The issuing bank may work with an issuer processor to connect with the debit network. The processor may also provide services like managing card issuance, authorizing or declining transaction, and communicating with settlement entities. The use of the issuer here means both issuing banks and issuer processors.

11

merchants' banks (the acquiring bank or acquirer[2]) so that merchants can and will accept their debit cards.

37.    Debit networks are the way that the thousands of issuers connect with acquirers and the millions of merchants that use them. Debit networks work by creating a debit credential or other unique identifier for each consumer. All merchants that participate in the network (by using an acquiring bank connected to the network) can then accept that debit credential or unique identifier to trigger payment. The debit networks further provide the "rail," the method by which acquiring banks and issuing banks communicate between each other to facilitate transactions and the transfer of funds. And debit networks guarantee payment for the merchants, allow consumers of their bank to dispute and chargeback transactions, and provide fraud protections to all parties.

38.    The debit networks also play a crucial role in the actual payments between banks, even though the banks themselves move the money from the consumer's bank to the merchant's. The debit networks facilitate this process by clearing and overseeing interbank settlements. Each day, the debit networks aggregate all of the transactions for each bank in their systems, net out the applicable fees, and provide the banks with daily settlement reports. The banks then use those reports to transfer the funds between themselves to cover that day's transactions.

39.    Debit networks also set the rules for transactions that use them. Visa is the largest debit network in the United States. It thus not only sets the rules for transactions on its network, but also uses its intermediary role and market dominance to influence the rules for all other networks.

---

[2] As with issuing banks, acquiring banks may also work with acquiring processors to send transaction data to the network. The use of acquirer in the Complaint refers to both acquiring banks and acquirer processors.

40.    As explained, debit cards themselves can be used to make in-person and online purchases from money in a consumer's bank account. As shown below, debit card credentials include various information: a 16-digit card number (debit card number), security features like an expiration date, the card verification value (CVV), an EMV security chip, and a four-digit PIN. The card also includes a graphic on the front of the card for the front-of-card network. And it sometimes includes a graphic on the back of the card for the back-of-card network(s). Few debit cards include more than two total unaffiliated networks: one front-of-card network and one unaffiliated back-of-card network.

**FIGURE 1**

**Front of Card**



**Back of Card**



13

41.     To initiate a debit transaction, a consumer presents her debit credentials to a merchant. This triggers a request from the merchant to its acquirer.

42.     Once the acquiring bank receives the request from the merchant, it sends the consumer's account and transaction information to a debit network like Visa to process the transaction for authorization, clearing, and settlement. In theory, merchants have a choice about whether to use the front-of-card network on the consumer's card (which is Visa for 70% of debit card payment volume) or a back-of-card network to facilitate the transaction. But in reality, any choice is illusory. Because of Visa's exclusionary and anticompetitive conduct, if Visa is the front-of-card network, the merchant's routing decision uses Visa by default.

43.     Once the debit network receives the customer's account and transaction information, it requests authorization from the issuer bank to approve the transaction. As long as the consumer has sufficient funds in their account (and, often, if there are no indications of fraud), the issuer bank will authorize the transaction. Once authorized, the issuer bank puts a hold on the consumer's funds and sends authorization to the debit network, which sends authorization back to the acquirer. But the debit network will authorize payment only of the funds requested *minus* the interchange fee, which is imposed by the network on the merchant and deducted by the issuer from the amount owed to the merchant.

44.     Finally, the acquirer sends the authorization response to the merchant. The merchant can then complete the transaction.

45.     For each transaction like the above that uses Visa's debit network, Visa collects several different fees. This amounts to fees on tens of billions of debit transactions each year.

46.     This process, for almost all debit card transactions, occurs in a matter of seconds. This allows debit cards to facilitate transactions between consumers and merchants quickly. It also

14

occurs in such a way that consumers usually don't know how much money is allocated between the merchants, debit networks, processors, and banks.

47.    While the above explains the process for both in-person and online debit transactions, the mechanics of in-person transactions where a physical card is used (card-present transactions) are slightly different from non-card-present transactions (including using debit credentials on a website, in an app, or over the phone). At present, card-not-present debit transactions make up about half of all debit spending, which is a significant increase since 2010 and is continuing to grow. For card-not-present transactions, the customer can manually enter her debit credentials or can use debit credentials stored in a digital wallet, like Google Pay, Apple Pay, or PayPal. These transactions almost never require inputting a PIN, unlike card-present transactions, instead relying on other security features like multi-factor authentication. But even with these differences, the process described above for executing the transaction across various banks and the debit network remains the same.

   b.  **Debit Networks**

      i.  **Issuers Determine Debit Cards' Enabled Networks**

48.    As explained, in the United States, debit cards must have a front-of-card network and at least one back-of-card network that is unaffiliated with the front-of-card network. Issuers select the front-of-card network and then choose which back-of-card networks to enable for a given debit card. As discussed *supra*, the front-of-card network is generally displayed via its logo on the front of the card. The back of the card may or may not include the logo of the back-of-card networks.

49.    Because issuers choose the front-of-card network, they effectively choose the debit network that consumers and merchants will use for transactions using a given card.

50.     For debit cards in the United States, Visa is the dominant front-of-card network. Mastercard is the second largest, with a much smaller market share. And outside of those two market participants, there are only two other competitors, each with much smaller market shares. Issuers rarely change their front-of-card networks because of high switching costs, including issuing new debit cards to accountholders. Visa also has reached long-term agreements with many issuers to remain the front-of-card network. As a result, Visa is confident that Mastercard and other debit networks have little chance of overtaking it as the front-of-card network for banks that already use Visa.

51.     Cards with Visa as the front-of-card network often also include Interlink, Visa's back-of-card network. As required by the Durbin Amendment, those cards also include one additional back-of-card network that is not affiliated with Visa, such as Mastercard's Maestro or a smaller debit network like STAR, NYCE, or Pulse.[3] Smaller debit networks like STAR, NYCE, and Pulse are also known as PIN networks because they grew out of ATM networks that required an accountholder to input a PIN number to withdraw money.

52.     That a debit card includes a given back-of-card network does not ensure that network can be used for every transaction using the card. Rather, issuers decide whether back-of-card networks can be used for given debit transactions. For instance, issuers may choose not to enable back-of-card networks for card-present transactions where a PIN was not entered.

### ii.     How Debit Networks Make Revenue

53.     Debit networks impose network fees for every debit transaction processed on their network, and the issuers deduct those fees from what is paid to the merchant.

---

[3] Debit cards with Mastercard as the front-of-card network operate similarly; they generally include Maestro as one of the back-of-card networks and one other back-of-card network unaffiliated with Mastercard.

16

54.    Debit networks like Visa impose two different types of fees on merchants: (1) per-transaction fees, and (2) fixed fees. First, the network (in this case, Visa) imposes a network fee for each transaction run on that network. The price of that fee varies based on the type of transaction, including whether the accountholder enters a PIN and whether the transaction is card-present or card-not-present. Second, beginning in 2012, Visa began imposing a monthly fee, referred to as the Fixed Acquirer Network Fee (FANF). That fee, as its name illustrates, is fixed, and is based on factors like the number of locations the merchant operates and the volume of the merchant's card-not-present transactions.

55.    The issuer also deducts another per-transaction fee imposed by the debit network from what it transmits to the merchant, called the interchange fee. For issuing banks with $10 billion or more in assets, the interchange fee is capped by the Federal Reserve. But for smaller issuers, the debit network sets the fee.

56.    Merchants pay fees imposed by the network, which are deducted from the funds the merchant receives for each transaction. And on top of that, the merchant pays a fee to the acquirer for the acquirer's services.

57.    For most transactions, Visa imposes network fees that are much higher than the equivalent fees imposed by PIN networks.

       **iii.    Visa Used the U.S. Debit Network's Evolution to Obtain Dominance**

58.    As explained, in the 1960s, the United States' first debit networks started as ATM networks. Banks issued ATM cards to customers so those customers could easily take money out of their accounts. To use the cards, the customers entered a PIN at an unattended ATM without having to go to a bank counter and provide a signature.

59.    This change benefited merchants, who could stop relying on checks. Those merchants began installing PIN pads on location to allow customers to use ATM cards at the point

17

of sale. At the same time, customers got used to carrying physical cards for purchase. Across the United States, more and more merchants established PIN pads on site. As this became increasingly common, the networks that enabled ATM withdrawals—including STAR, NYCE, and Pulse—evolved into the PIN networks.

60.    Visa and Mastercard were dominant in credit card infrastructure before entering the debit network space. After ATM cards were introduced, Visa and Mastercard began building front-of-card debit products utilizing their credit card infrastructure. When debit cards emerged, Visa and Mastercard were each joint ventures owned and controlled exclusively by their member banks, which were effectively all U.S. banks. Visa used the scale its member banks provided to jump start its debit business. In the 1990s, Visa debuted its point-of-sale debit product, the Visa Check Card. Visa was quickly able to scale using its member banks, which each issued debit cards with Visa's logo. Visa processed debit purchases over its existing credit card rails, unlike the PIN networks which used rails designed for ATM networks. Visa and Mastercard also already had access to merchants who accepted their credit cards. This allowed Visa and Mastercard to roll out widely accepted debit cards. And to aid this roll out, Visa's network rules initially required that merchants accept both its credit and debit cards. As Visa worked with issuers to add its credit processing infrastructure to the issuers' base of ATM cards, Visa was able to quickly scale its debit offerings.

61.    Until the early 2000s, Visa and Mastercard had exclusive relationships with their respective issuers. Thus, those issuers were prohibited from issuing American Express or Discover-branded credit and debit cards, impairing those networks' growth. In 2003, however, the Second Circuit held that those restrictions were illegal under the antitrust laws and affirmed a district court's injunction. After that, Visa and Mastercard settled private litigation on the same

issue. As part of that settlement, they agreed to allow merchants to accept their debit cards without accepting their credit cards, and to accept their credit cards without accepting their debit cards.

62.     By this point, though, Visa was already dominant in debit. Between 2006 and 2008, Visa and Mastercard separately went public, and their former member banks purchased significant stock in them. Even though issuer banks could, under the injunction and settlement, issue Visa- and non-Visa-branded debit cards, most chose to issue only Visa-branded or Masterbrand-branded cards. So, those two companies fought for front-of-card placement. But each company had little ability to displace the other as an issuer's front-of-card network because issuing new cards to all accountholders was difficult and costly. And companies, besides Visa and Mastercard, rarely achieved front-of-card status because they did not have the same scale of merchant relationships. At this time, prior to the Durbin Amendment, banks often featured only one network, the front-of-card network, on their debit cards. Those networks were almost always Visa and Mastercard. Merchants therefore had to use whichever of Visa or Mastercard were on a given card for routing transactions related to that card.

63.     That practice remained until 2012, when Congress passed the Durbin Amendment requiring each debit card to support at least two unaffiliated networks. That is, issuers had to enable an unaffiliated back-of-card debit network which could compete with the front-of-card network (like Visa) for transactions, with the goal of increasing merchants' choice for routing debit transactions.

64.     For debit transactions run on cards issued by issuers with more than $10 billion in assets, the Durbin Amendment also limited the interchange fees that merchants pay for every debit transaction. That rule has a no-evasion provision, so a network is limited in providing incentives to issuers by paying them above the cap. The limit made it even more difficult for Mastercard or

other networks to win front-of-card placement from Visa because they could not fully compensate the issuer for its switching costs.

65.     Notwithstanding the Durbin Amendment, Visa remains the largest debit card network in the United States today by far. Mastercard is much smaller and has not been able to gain significant share from Visa or restrain Visa's monopoly. To the contrary, Visa is the front-of-card brand for over 70% of debit card payment volume in the United States, while Mastercard is front-of-card for only about 25% of payment volume. American Express and Discover are much smaller. This gives allows Visa to be the dominant front-of-card network.

### iv.     PIN Networks Cannot Meaningfully Compete for Debit Transactions

66.     For a debit network to win a transaction, it must be put on the debit card used for the transaction by the issuer. But even if a network is on a card, it may still be unable to win certain transactions because a party to the transaction—either the issuer, acquirer, or merchant—has not enabled it to process such transactions.

67.     In all events, to compete effectively, a debit network must have sufficient scale on both the issuer and merchant side of the debit market. For a debit network to be effective and desirable, it must be broadly accepted and enabled by all network participants, including accountholders, issuers, acquirers, and merchants. If more issuers place a network on a card, more accountholders will present that card for payment, and more merchants and acquirers will accept the network. But if issuers do not place a network on a card, accountholders will not present the card for payment, and merchants and acquirers will not be incentivized to accept the network, and vice versa. This feedback loop is known as network effects.

68.     For Visa, these network effects are not a problem because it is already the default routing option when it is front-of-card. But it would be a tremendous task for smaller PIN networks and potential competitors to build scale on both sides of the market given the market dynamics.

20

69.     Nonetheless, PIN networks have continued to innovate. Even though such networks are still referred to as PIN networks, that title is in some ways a misnomer: the networks have developed the ability to process debit transactions without requiring customers to enter PINs. These are referred to as PINless debit transactions. PINless technologies allow PIN networks to process card-not-present transactions like online purchases and in-person transactions where customers do not enter a PIN.

70.     Notwithstanding these innovations, Visa imposes rules and terms on the merchants and acquirers with whom it contracts that, in effect, require those merchants (or the merchants that use those acquirers) to route the vast majority of their debit transactions to Visa, rather than back-of-card networks like PIN networks and Maestro. Because of Visa's dominance, Visa's exclusionary rules, and PIN networks' small sizes, PIN networks can compete for only a small fraction of debit transactions. Put another way, Visa's merchant and acquirer contracts lock up a substantial portion of debit transaction volume, depriving Visa's rivals of scale and artificially limiting routing options.

71.     Visa is able to impose these contractual terms in part because certain transactions must be routed to Visa under any circumstance, because back-of-card networks cannot process them. These transactions are non-contestable. Back-of-card networks are not available for certain types of transactions, like transactions over a certain dollar amount and transactions that do not meet certain encryption criteria. Card-present transactions can also be non-contestable if the issuer does not allow the network to process card-present PINless transactions and the network's PIN option is unavailable (for instance, when the merchant does not prompt the customer to enter a PIN). Acquirers also sometimes cannot enable smaller PIN networks. Card-not-present

21

transactions may be non-contestable if they are tokenized.[4] For instance, only a very small fraction of card-not-present tokenized transactions were routed over an unaffiliated network in 2023.

72.    A significant percentage of Visa-branded debit card transactions are non-contestable. In addition to the above reasons, this is because issuers—sometimes at Visa's urging—generally do not enable card-not-present PINless transactions, deterring merchants and acquirers from enabling card-not-present PINless transactions and ensuring that card-not-present PINless transactions are effectively non-contestable.

73.    Merchants must accept Visa or lose a substantial number of sales. A huge number of consumers use Visa-branded cards, so virtually all merchants accept Visa. This means that virtually all merchants must route at least non-contestable transactions to Visa, rather than utilizing less costly back-of-card networks.

### v.    Alternative Debit Networks

74.    Debit cards are the most common way to make debit purchases in the United States, but alternative options exist too. These options include using alternative rails—*i.e.*, methods that allow acquirers and issuers to communicate to facilitate transactions—developed by fintech companies (fintech debit).

75.    A fintech debit network can facilitate consumer-to-merchant payments by providing end-to-end functionality that is similar to debit card networks. Fintech debit networks authorize payments from a consumer's bank account, facilitate communications with the consumer's bank to authorize and clear the transaction, and provide settlement services by initiating payment to the merchant's bank. Fintech debit networks can complete the transfer of funds to the merchant's financial institution by using money transfer services available to banks,

---

[4] Tokenizing is an encryption technology used to facilitate some Visa-brand debit card transactions that are initiated online, in a mobile app, or with a digital wallet.

22

like Automated Clearing House (ACH) or Real Time Payment (RTP) networks. These are lower-cost alternatives to Visa's debit network.

76.    Alternative debit networks could provide the same functionality as debit card networks like Visa's—including a credential to be used at merchants, payment guarantees, the ability to dispute charges, chargeback capabilities, and fraud protection—at a lower cost. Visa understands this potential threat to its place as the dominant network to process debit transactions. Indeed, Visa is concerned about fintech companies pursuing an alternative network that would provide alternative debit networks that can compete with Visa.

## VI.    VISA USES EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT TO DOMINATE DEBIT TRANSACTIONS IN THE UNITED STATES

### a.    Visa Has Long Been the Largest, Most Powerful Debit Network

77.    Visa is one of the most profitable companies in the United States. In 2022, its global operating income was $18.8 billion and its operating margins were 83%.

78.    Visa's largest source of revenue globally is its U.S. debit business. Visa charges over $7 billion in network fees on U.S. debit volume annually. This earns Visa $5.6 billion in net revenue. Indeed, in 2022, Visa earned more revenue from its U.S. debit business than its U.S. credit business. And it earned more from its U.S. debit business than its debit businesses in any other part of the world.

79.    Each additional transaction on Visa's network has effectively no incremental cost. On top of that, Visa is insulated from any risk related to fraud. The merchant, acquirer, or issuer may bear the financial risk for fraudulent debit purchases, but not Visa.

80.    Visa's very high share of debit transactions has barely moved in years, notwithstanding regulatory changes, the rise of e-commerce and mobile payments, and new technologies being brought to market. To date, Visa's network still processes over 60% of debit

23

transactions and 65% of card-not-present debit transactions in the United States. These numbers have not budged as Visa has imposed supracompetitive fees, stabilized those fees, and depressed price competition.

81.    Visa preserves its debit monopoly by (1) preventing competitors from building a debit network to scale to rival Visa, and (2) preventing would-be competitors from getting to market.

82.    First, Visa maintains its monopoly positions against smaller competitors like PIN networks by preventing them from scaling with merchants and acquirers, and with consumers and issuers. Visa locks up merchant debit volume with *de facto* exclusive deals that effectively require those merchants (or their acquirers) to route available transactions through Visa. Visa then locks up issuers by paying them to take actions that limit merchants and acquirers' ability to route payments to PIN networks, for instance by getting issuers to agree not to enable PINless routing. If merchants (or their acquirers) or issuers refuse these deals, they are subject to heightened fees. Unsurprisingly, they rarely refuse them. Through these actions, Visa ensures that more transactions are non-contestable, maintaining its leverage over both issuers and acquirers and preventing a tipping point at which PIN networks would be broadly enabled by merchants.

83.    Second, Visa induces would-be competitors to agree to not introduce or support innovations that could replace Visa's traditional debit network. If the would-be competitors refuse to agree to these terms, they are subject to high penalties through increased fees for their existing products. In sum, through threatened heightened fees, Visa ensures that virtually all merchants, acquirers, issuers, and digital platforms with whom it contracts choose its deals.

### b.  Visa Entered into Contracts with Merchants, Acquirers, and Issuers to Hinder PIN Networks

84.    Visa's control of the debit network is the result of an intentional strategy to lock up debit volume to prevent competition, not an accident or the result of continued innovation. To maintain its dominance, Visa has and continues to thwart competition from smaller debit networks like the PIN networks and avert government regulation intended to promote competition like the Durbin Amendment.

85.    As explained, the Durbin Amendment, which went into effect in 2012, posed a regulatory threat to Visa's debit network dominance by requiring all debit cards to support at least one network unaffiliated with the front-of-card network—*i.e.* for Visa-branded cards, at least one non-Visa-affiliated network. The Amendment aimed to foster at least some competition among debit networks, given that historically merchants and acquirers had no choice but to run transactions on front-of-card networks.

86.    Then, in 2023, the Federal Reserve adopted Regulation II, clarifying the Durbin Amendment to require that issuers enable at least one back-of-card network that is unaffiliated with the front-of-card network for card-not-present transactions.

87.    Visa responded to these regulations not with compliance and competition but attempts to evade to maintain its dominance. After the Durbin Amendment was passed, Visa recognized that PIN networks, certain large merchants, and other companies that worked with debit networks could try to shift away from Visa. Visa decided it needed to act quickly to avoid that outcome.

88.    Visa acted, curbing the effect of the Durbin Amendment by leveraging merchants and banks' reliance on Visa for certain types of transactions. Even after the Durbin Amendment, Visa understood that around 45% of card-present transactions where Visa is the front-of-card network are non-contestable. And even more of those transactions are non-contestable for card-

25

not-present transactions run on Visa-branded cards. For a large portion of both card-present and card-not-present transactions, merchants and acquirers *must* use the front-of-card network. And for 70% of debit card payment volume, that front-of-card network is Visa.

89.     That so many debit transactions must be run on Visa's network—even if another unaffiliated network is generally enabled on the back-of-card—allows Visa to demand significant volume commitment from merchants, acquirers, and issuers. Visa uses two methods to obtain these commitments, which require merchants and acquirers to run an overwhelming proportion of Visa-eligible transactions on Visa's debit network and ensures issuers act to facilitate the same. First, Visa gives acquirers, issuers, and even some merchants some of its monopoly profits, to ensure exclusivity. Second, unless merchants and acquirers sign routing agreements that include severe penalties for failing to achieve exclusivity requirements, Visa charges the merchants exorbitant rack rates, or listed prices, divorced from incremental costs for network and interchange fees.

### i.    Visa Imposes Contracts on Merchants and Acquirers That Unlawfully Inhibit Competition

90.     Unless they route all or nearly all eligible debit transactions to Visa's network, most merchants face substantial annual penalties from Visa. In effect, Visa ensures that if merchants route more than a small fraction of their Visa-eligible transactions to other networks, they will face high fees on the non-contestable transactions that they *have* to route through Visa. This significantly hinders PIN networks' ability to compete with Visa for debit transactions and stifles the purpose of the Durbin Amendment.

91.     Visa signs routing contracts with (1) many large merchants, and (2) acquirers that control the routing decisions for merchants who do not contract with Visa. These contracts ensure that the merchants route nearly all Visa-eligible debit transactions through Visa. In effect, Visa

pays merchants and acquirers to route nearly all eligible transactions through Visa and imposes severe penalties on merchants if they fail to do so.

92.    For instance, Visa sometimes contracts with merchants to get top positioning on that merchant's routing table, which is a ranked list that determines the network to which a given debit transaction should be routed. If the merchant fails to put Visa in the top or an otherwise high position on the table, Visa threatens to charge the merchant with high rack rates on all Visa-routed transactions. In effect, Visa threatens cliff pricing: If the merchants route some transactions away from Visa, they're punished with high rates on the Visa transactions that they do run. Unsurprisingly, to avoid those punitive rates, dozens of merchants that account for hundreds of billions of dollars in 2023 debit payment volume have agreed to route 100% of their eligible volume to Visa. Indeed, Visa paid over $20 million to one large merchant for exclusivity. Visa has different pricing terms with different merchants and acquirers, but a near universal term is that the merchants and acquirers must commit to routing significant Visa-eligible volume through Visa's network.

93.    Visa thus artificially raises the cost merchants will incur on Visa transactions if they route other transactions to non-Visa networks. And beyond simply charging punitive rates on the remaining Visa transactions, Visa often allows itself to terminate entire contracts and claw back incentives paid to merchants if they fail to meet their volume requirements. Terminating some of these contracts would impact debit *and* credit transactions for the merchant, because the network fees covered under the contract apply to both. Indeed, Visa sometimes uses credit interchange discounts to win debit routing.

94.    These contracts artificially increase the cost merchants face if they route transactions to non-Visa networks. Visa structures its volume commitments using cliff pricing (or

"all unit" pricing). That is, Visa grants merchants lower prices for transactions routed to Visa on the condition that the merchants' (or their acquirers') total volume of transactions to Visa exceeds its commitment. But if a merchant does not meet the commitment, Visa imposes its high rack rates on *all* of that merchant's transactions routed to Visa. Put another way, Visa gives merchants substantial discounts on network and interchange fees, and pays cash concessions, but only if they stick to their volume commitments. Except for limited safe harbor provisions, if merchants fall even .01% short on their volume commitments, Visa can impose significant monetary penalties on all of the merchant's Visa debit transactions (not just the marginal transactions). Each penalty thus provides an additional cost to the merchant for routing away from Visa. This pricing mechanism discourages merchants from routing to Visa's competitors, denying those competitors the scale necessary to compete with Visa.

95.     Merchants (or their acquirers) accept these *de facto* exclusive deals with Visa because they have a significant number of non-contestable transactions that they *must* run through Visa. As a result, merchants have two choices: (1) agree to Visa's volume commitments, or (2) pay supracompetitive, punitive rack rates for non-contestable transactions that must run through Visa and route their contestable transactions through a Visa competitor. As explained, Visa's rack rates are generally higher than PIN networks' rack rates. But to get better rates from Visa, merchants have to route all or nearly all—usually 90-100%—of their Visa-eligible debit volume through Visa. Functionally, Visa uses its control over merchants' non-contestable transactions to get them to agree to higher volume commitments at higher rates than Visa would be able to secure in a competitive market.

96.     A hypothetical demonstrates why Visa is able to do this. Imagine a merchant that commits to a cliff pricing agreement with Visa. Assume on a single day the merchant has one

hundred customers that present Visa-branded debit cards, and they all have the same back-of-card network. Fifty of the customers order online—those card-not-present transactions may be contestable by the non-Visa network. But the other fifty customers present Visa-branded debit cards in person, their cards are not enabled for card-present PINless transactions, and they do not enter a PIN. These fifty in-person transactions are non-contestable because they cannot be routed to the back-of-card PIN network. So, they must be routed to Visa. And under the terms of Visa's routing agreement, the merchant can avoid high rack rates on those fifty non-contestable transactions only if it also routes the fifty contestable transactions to Visa.

97.    The merchant will be incentivized to do that. Assume Visa's rack rate for these transactions is $.50 per transaction and its rate for all one hundred transactions is $.25 per transaction. If the merchant accepts Visa's terms, it will pay $.25 on 100 transactions, equaling $25. If the merchant does not accept Visa's terms, it will still pay $.50 on the 50 transactions that it has to route to Visa, equaling $25. So, a smaller PIN network could only compete for the *other* 50 contestable transactions if it offered them *for free*. If the pin network charged even $.01 per transaction in this hypothetical, the merchant would still pay more for the 100 transactions than under Visa's offer. Put another way, the merchant either pays Visa $25 to send all of its transactions to Visa, or it pays Visa at least $25 to send half of its transactions to Visa on top of whatever it has to pay the PIN network for the other half of the transactions. PIN networks usually cannot route transactions for free. So, Visa's pricing structures have the effect of forcing merchants into *de facto* exclusive agreements with Visa for nearly all of their Visa-branded debit transactions.

98.    Some acquirer processors that operate rival PIN networks have even agreed to exclusive routing agreements with Visa. To reach those agreements, Visa provides the acquirer

29

processors with monetary incentives in exchange for volume commitments. Visa's payments further disincentivize the PIN networks from competing with Visa for volume.

99.     Given Visa's actions, a PIN network must accomplish several difficult things to win a meaningful number of transactions from Visa. First, it must offer cheaper per-transaction price than Visa. Second, the PIN network must also compensate the merchant for the penalty Visa will impose on the transactions that it still has to route to Visa—which will be larger than the transactions for which the PIN network can compete. But as explained, to compensate the merchant, the PIN network might have to impose zero or negative per-transaction prices. This dynamic illustrates the significant and cost-prohibitive barriers Visa has erected to bar the PIN networks from expanding.

100.     Visa understands that these barriers allow it to impose supracompetitive fees on debit transactions. Visa has so many non-contestable transactions that, in its view, its profits would decrease if it lowered the prices of its fees for debit transactions. And if Visa lowered its high rack rates, it would not be able to use those rack rates as leverage to get merchants and acquirers to agree to volume commitments. Visa does not compete on the merits for debit transactions. It keeps its penalty prices high to protect its supracompetitive profits by foreclosing rivals.

101.     Visa does not stop there. To ensure even more debit transactions are routed through its network, Visa sometimes also prices other products like credit transactions based on a merchant's debit volume. For example, to entice Google to route its debit transactions through Visa and prevent it from enabling PINless networks, Visa offered Google credit incentives. It did the same with a health food supermarket chain. Visa recognizes that merchants cannot choose to route contestable debit transactions away from Visa if doing so will mean higher fees on non-contestable debit *and* credit transactions that are run through Visa. While Visa can draw on its

credit business to attract and lock up debit volume, PIN networks have no such credit businesses from which to offer incentives.

102.    Moreover, Visa has introduced new fees so that it can waive them in exchange for volume commitments from merchants, again limiting other networks from gaining debit transactions. In 2012, after the Durbin Amendment was enacted, Visa introduced the FANF, a fixed monthly fee imposed on merchants facilitated through acquirers on top of the per-transaction fees they already paid. Since 2012, Visa has raised the FANF twice. Visa uses its willingness to waive the FANF as another mechanism to get merchants and acquirers to commit to *de facto* exclusive volume agreements.

### ii.    Visa Imposes Contracts on Issuers That Unlawfully Inhibit Competition

103.    The number and identity of debit networks included on debit cards are chosen by the issuer. Although the Durbin Amendment requires at least one additional network not associated with Visa on each card, issuing banks could enable multiple networks and give merchants increased choices, furthering competition. However, in practice, Visa is able to wield its monopoly power to induce issuers to limit potential competitors' enablement, stifling competition.

104.    For example, Visa's issuing contract with JPMorgan Chase explicitly requires that 90% of Chase-issued Visa-branded debit cards enable only one unaffiliated PIN network. As another example, in 2023, Visa contracted with one of its largest debit-issuing fintech customers to require only a single non-Visa network on all debit cards issued through the customer's issuing banks.

105.    By different tactics, Visa's contracts with both large and small issuing banks accomplish the same goal. Using significant volume incentives, Visa's contracts with almost 1,000 issuers strongly disincentivize listing additional networks. Under these contracts' standardized

volume requirements, if the issuer does not maintain annual growth of Visa debit transactions in line with Visa's nationwide debit growth, Visa has the power to impose significant monetary penalties. For instance, if an issuer fails to maintain Visa's annual growth, it may be forced to pay early termination fees of both a percentage of benefits already earned and a fixed, multimillion dollar fee. These volume contracts ensure that Visa's share of issuer transactions will not decrease.

106.    These volume targets incentivize users to neither add additional networks nor enable additional transaction types—such as PINless routing—for existing networks. The minimum volume requirement in a 2020 issuing contract, for instance, was designed to prevent a shift to PINless networks or Real Time Payment. Visa drafted the contract to prevent issuers from shifting to PINless by requiring issuers to dump PINless networks if too much volume was being shifted to them.

107.    Likewise, Visa agreed to incremental debit incentive deals with several large issuers to make it difficult for those issuers to enable PINless or face-to-face transactions. Additionally, Visa enters agreements with issuer processors—which many smaller issuers rely on to select networks—in order to dissuade those processors from selecting and enabling PINless networks.

108.    These contracts with issuers entrench and enhance the protections provided by Visa's routing contracts with merchants and acquirers by creating artificial barriers to entry and expansion and effectively expanding the percentage of transaction volume that is uncontested. As a result, only networks enabled on Visa-branded debit cards can even compete for transactions, regardless of the merchant's preferred network. And because Visa is the dominant front-of-card network, it is able to process over 70% of debit card volume in the United States.

32

109.     These volume requirements in issuer contracts, like the volume requirements in Visa's routing contracts with merchants and acquirers, have cliff pricing structures. Visa has the ability to inflict significant penalties across all Visa transactions—not just marginal ones—if the issuer has any meaningful shortfall. If an issuer's failure to achieve the agreed level of exclusive volume in a given year is attributed to any affirmative act of the issuer—such as and including the enablement of additional PIN networks—Visa can inflict monetary penalties on merchants that accept that issuer's cards or an early termination penalty.

110.     Similar to how it uses discounts on various products to achieve merchant routing volume, Visa leverages discounts on products such as its Debit Processing Services to win issuer routing volume. To win large banks' business, Visa will bundle its card-brand issuance contracts with its Debit Processing Services.

### iii.     Visa Took Successful Steps to Entrench its Monopoly Position in Response to the Durbin Amendment

111.     After the Durbin Amendment, Visa worried that competition from rival PIN networks would threaten its monopoly position in the debit market. However, although the Durbin Amendment had some initial success in allowing smaller PIN networks to gain market share from Visa, Visa took steps to entrench its dominance, and has recovered and increased its market share in the 14 years since the Durbin Amendment. As Visa itself recognizes, it continues to dominate the market despite the generally lower prices PIN networks offer.

112.     In the early years following the Durbin Amendment, smaller networks took steps to challenge Visa's monopoly position. Mastercard, for instance, launched a PINless program for Maestro that intended to target Visa-branded debit cards. But these attempts were ultimately unsuccessful, as Visa repeatedly used its dominant scale and its arsenal of non-contestable transactions to punish any merchant, acquirer, or issuer that attempted to explore these alternatives.

33

113.    Visa responded to these threats to its dominance with a fervent campaign to lock up the entities that control routing decisions in exclusive contracts. Today, Visa has effectively exclusive routing contracts with more than 180 of its largest merchant and acquirer customers. Over three quarters of Visa's debit volume is covered by Visa's merchant and acquirer contracts, which allows Visa to foreclose at least 45% of the country's total debit volume.

114.    These contracts prevent would-be competitors from achieving the scale needed to compete; when merchants overwhelmingly route to Visa, issuers have a lesser incentive to add additional networks to their debit cards. Moreover, Visa's contracts with issuers only enhance this effect: By incentivizing issuers to make more transactions non-contestable (by, for example, disabling or choosing not to enable card-present PINless transactions), Visa achieves additional control over merchants and acquirers.

115.    Visa engaged in a similarly fervent campaign to entrench its position in response to the Federal Reserve's October 2022 clarification of the Durbin Amendment's implementing rules, known as Regulation II. Before Regulation II went into effect, Visa acted to lock up even more volume under routing deals, to renew existing merchant and acquirer agreements, and to enter new merchant and acquirer contracts for longer commitments with early termination fees.

116.    The Dodd-Frank Act 12 U.S.C. § 5303, which includes the Durbin Amendment, states that the requirements imposed on companies are in addition to, not to the exclusion of, those provided by the antitrust laws, including the Sherman Act. Accordingly, technical compliance with the Durbin Amendment does not exempt Visa, acquirers, and other debit networks from complying with antitrust law.

   iv.    **Visa Wields its Monopoly Position to Prevent Would-Be Competitors from Gaining a Meaningful Market Share**

34

117.    By achieving scale on both sides of a two-sided transaction platform, Visa has been able to entrench its monopoly power even more effectively and durably through powerful network effects. By locking up both sides of the debit market (consumers and issuers on one side, and merchants and acquirers on the other side) in anticompetitive contracts, Visa is able to prevent any other debit network from viably competing for market share.

118.    On the issuer side of the market, Visa incentivizes its customer banks to provide fewer non-Visa network and routing options. And because fewer issuers enable Visa's PIN-network competitors or allow them complete functionality, it becomes more burdensome and expensive, and less beneficial, for merchants and acquirers to enable routing to these competitors.

119.    As a result, these competitor networks are unable to achieve an efficient scale or improve their features, which creates a negative feedback loop: Due to Visa's anticompetitive conduct, they lack the usage or acceptance to viably compete, and the lack of competition allows Visa to further entrench its monopoly position. Visa dominates the market for non-contestable transactions, and then uses this dominance to require and enforce exclusive contracts.

120.    As a result, to compete with Visa, a competitor PIN network would not only need to provide a better, cheaper service than Visa on the merits, but would also need to compensate both sides of the market—merchants, acquirers, and issuers—for the draconian penalties Visa would impose for violating its *de facto* exclusivity agreements.

121.    This network of anticompetitive agreements makes it virtually impossible for competitor networks to win market share from Visa. Despite the PIN networks' generally lower prices and development of new features to compete with Visa, as well as their increased placement on the back of debit cards required by the Durbin Amendment, Visa's tactics have prevented PIN

35

networks from gaining sufficient traction on either side of the market to surmount these powerful network effects.

122.    Today—14 years after the Durbin Amendment went into effect—PIN networks *collectively* process 11% of all debit transactions in the United States, and only 5% of card-not-present transactions; no PIN network has more than a single-digit market share.

123.    These smaller networks have attempted to win market shares through fair competition: by offering lower fees, innovating, and adding new features and services. But Visa's massive size, anticompetitive conduct, and control of non-contestable transactions has made these attempts futile.

124.    Moreover, because networks need a critical mass of transaction data to reliably detect fraud, this lack of scale has prevented smaller networks from offering comparable fraud protections to the market leaders. PIN networks are unable to compete with the speed and accuracy of Visa's fraud protection without this critical mass; as a result, Visa, by its own recognition, continues to win market share despite PIN networks' lower prices.

125.    These market dynamics allow Visa to take further anticompetitive steps to entrench its position. For instance, in 2023, issuers permitted less than half of total debit volume in the United States to be processed as card-present PINless transactions, which led many merchants not to enable such transactions. Visa believed an increase in card-present PINless enablement would benefit its competitors, and it feared that the enablement of card-present PINless by one large issuer could create a tipping point toward the widespread availability of such transactions.

126.    Accordingly, Visa acted to prevent such a tipping point from occurring. One such example involved JPMorgan Chase, which issued Visa-branded debit cards with Mastercard's Maestro as its back-of-card network. In 2023, Chase—which was prohibited by its contract with

36

Visa from adding a second back-of-card network—requested relief from this requirement to add Discover's Pulse network, in order to comply with Regulation II. At that time, Pulse—unlike Maestro—offered both card-present and card-not-present PINless functionality.

127.    Visa worried that if Chase were permitted to add Pulse, it could create the tipping point for merchants and acquirers that could result in a substantial amount of merchant volume being enabled for PINless. If that happened, Visa worried that a substantial amount of card-not-present transactions would be priced lower by PINless networks compared to Visa. As a result, more merchants would adopt PINless networks, resulting in Visa losing transactions and having to lower its prices. Fearing that competition from these more affordable alternatives, Visa allowed Chase only a short-term waiver to temporarily add Pulse, while requiring Chase to sign a new debit-routing agreement with Visa.

### c.    Visa Wields Its Monopoly Position to Coopt Innovative Network Alternatives and Prevent Them from Competing

128.    In addition to the debit card network dominated by Visa, there are a number of alternative methods for consumers to pay merchants directly from their bank accounts that do not require debit cards at all. These alternative methods—such as alternative debit networks developed by fintech companies—could remove Visa's role in the transaction entirely. Fintech debit networks use consumers' bank account numbers, rather than debit cards, to enable consumers to purchase directly from their accounts. By storing consumers' bank credentials, these debit networks allow accountholders to purchase from merchants that participate in their networks without the need for a traditional network like Visa's.

129.    Such innovations have already occurred outside the United States. If replicated in the United States, such alternative networks would pose an existential threat to Visa's business. Visa has responded with a yearslong campaign to use its market dominance to stymie and coopt

37

these innovators, ultimately exacting concessions that prevent them from challenging Visa's monopoly.

130.    Alternative debit competitors can take several forms. One notable alternative is the digital wallet, a software-based product that stores a consumer's payment information—usually on a smartphone or computer—and uses it to fund purchases from merchants. Apple Pay, PayPal, and Google Pay are all well-known digital wallets.

131.    Recognizing the threat posed by these debit alternatives, Visa has adopted a different strategy than it uses to stymie its traditional rivals. Visa views potential competitors as companies that it can partner with to avoid competition, rather than as competitors.

132.    With the rise of mobile payments, the last decade has seen a significant increase in the volume of online debit transactions. However, despite the feasibility of alternatives to traditional debit payments—and the adoption of these alternatives in other countries—new and innovative technologies continue to run through Visa's network in the United States.

133.    These fintech companies' failure to develop viable payment alternatives is again the result not of competition on the merits but of Visa's deliberate strategy to wield and maintain its monopoly power. Since the emergence of these potential alternatives, Visa has remained vigilant to any technology that could threaten Visa's role as the intermediary for both sides of debit transactions. And when these potential alternatives arise, Visa does not compete with them on price or quality; instead, it aims to partner with the would-be competitors before they can ever become disruptors.

134.    Visa accomplishes this, in part, by sharing its monopoly profits in exchange for protections against disintermediation. These include custom incentives programs through which Visa's largest and most important merchants exchange disintermediation/non-discrimination

38

protections, non-disparagement, and future commitments for custom incentives. These contracts are by Visa's own admission not based on economic substance, and are not related to routing.

### i. Visa Recognizes that Fintech Alternatives Threaten to Disintermediate Its Debit Network

135.    For the last decade, Visa has been vigilant to the possibility that fintech alternatives could circumvent Visa's role at the center of both sides of a debit transaction and thus threaten its monopoly. A fintech network can authorize payments, clear transactions with a consumer's bank, and settle transactions by remitting payment to the acquirer. Moreover, these networks can provide the same guardrails as the debit card networks: payment guarantees for merchants, fraud protections, and chargeback services. In other words, fintech networks can provide every element of the debit card network services currently dominated by Visa.

136.    Developments in recent years have only heightened Visa's fears of innovative alternatives. Alternative payment rails that allow real-time money transfers have become increasingly available, and a growing number of fintech companies have emerged that are able to build on these rails and potentially compete with Visa. In particular, these companies pose a direct threat to Visa's highly profitable dominance of card-not-present transactions by enabling direct mobile transfers.

137.    Moreover, payment processors, banks, and other firms that can build connections between issuing banks and merchants all have the capacity to integrate these fintech debit services. Visa is concerned that real-time fintech transfers will turn into a substitute for debit option for merchants.

138.    At core is Visa's fear that large tech companies may attempt to develop widespread, alternative payment networks that enable consumers to remit payment directly from their bank

accounts and displace card-based funding options entirely. The recent development of viable, cheaper non-card-based alternative payment rails has only exacerbated these fears.

139.    Payment networks have for decades facilitated bank transfers using an interbank payment service called the Automated Clearing House ("ACH"). ACH takes multiple days to settle a payment, and even longer before the payment appears in a consumer's account, which limited its utility for real-time transfers. But innovator firms have begun improving upon ACH, both by building new capabilities on ACH and also by developing a new infrastructure—known as real-time payments ("RTP")—as a faster ACH alternative.

140.    In 2017, The Clearing House launched RTP Network, which allows immediate transaction clearance and settlement, and in 2023 the Federal Reserve launched FedNow, which allows instant payments between depository institutions. As increasing numbers of banks connect to these payment alternatives, they have the potential to facilitate near-instant payment transfers without the use of debit-card networks. Despite these developments, however, very few digital wallets or other debit payment alternatives have incorporated these real-time payment networks.

141.    Digital wallets come in two primary forms: staged wallets (also known as stored value wallets), and pass-through wallets. Staged wallets allow consumers to make purchases using funds stored in the wallet. These funds may be preloaded, or may be transferred into the wallet from a linked bank account. PayPal and Square's CashApp are examples of staged wallets in the United States. Pass-through wallets, meanwhile, transmit the consumer's payment information directly to the merchant's acquiring bank. The acquirer then processes the payment much like a traditional debit-card transaction. Apple Pay and Google Pay are examples of pass-through wallets.

142.    These digital wallets pose a particular threat to Visa's dominance because they are capable of achieving the necessary scale—on both sides of the market—to succeed as independent

payment platforms. Just like with Visa's traditional debit card network, fintech debit networks require two-sided buy-in: To succeed, a critical mass of consumers need to enroll in the fintech network, and a critical mass of merchants need to accept the service. And tech companies like Apple, PayPal, and Square had this critical mass, with millions of participating merchants and over one hundred million accountholders in the United States.

143.    Visa is well aware of this risk. Apple Pay's scale and popularity on both sides of the market, Visa understood, posed a serious and major threat to its debit business. In fact, Visa knew Apple had engaged in discussions with a large issuer about building a new debit network without Visa or Mastercard. Visa knew that, if Apple—alone or with a partner entity—could build a viable debit network without using Visa's payment rails, its longstanding dominant market position could be in jeopardy.

### ii.    Visa Used Its Monopoly Position to Prevent Staged Wallets Such as PayPal from Disrupting the Debit Market

144.    PayPal, according to one Visa executive, for a time successfully disintermediated Visa—the only major entity to do so. But this success was short-lived: In 2016, PayPal made a deal with Visa to effectively cease competing with Visa's network. Visa achieved this agreement by using its trademark tactics—the carrot of big payouts and the stick of inflated fees—to bring PayPal's transaction volume back onto Visa's network.

145.    As merchants expanded into e-commerce in the 2000s and early 2010s, many began taking PayPal as a form of online payment. Visa initially supported PayPal: Because some PayPal customers used their Visa debit cards to pay for their online transactions, PayPal brought significant volume to Visa's rails.

146.    However, in 2015, PayPal was spun off from its former owner, eBay. Visa then grew wary of PayPal, which it believed would be more aggressive now that it was no longer owned

41

by eBay. Visa viewed PayPal's growing scale and its decision to encourage customers to pay directly through their bank accounts rather than debit or credit cards as significant threats that risked disintermediating Visa.

147.    As a staged wallet, PayPal users loaded funds into their PayPal wallet using their bank credentials. PayPal then allowed users to make purchases using ACH. These ACH transactions had many of the benefits of debit card transactions, including dispute procedures, fraud detection, and fund guarantees. Visa viewed ACH-enabled staged wallets as a threat, due to increased disintermediation risk.

148.    Certain Visa executives viewed developing a commercial relationship with a company offering a staged wallet as a nonstarter. However, once again, Visa was able to use its dominant market position to thwart PayPal's competitive threat before it arose. Despite PayPal's encouragement of direct bank-account payments through ACH, many of its users still opted to pay through their Visa-branded debit cards. Visa used this debit volume to raise the threat of prohibitive wallet fees and rack rates if PayPal did not agree to an expansive routing contract. When faced with the risk of losing the business of Visa debit cardholders, PayPal had no choice but to agree.

149.    Simultaneously, Visa used its market power to undermine PayPal's attempts to partner with brick-and-mortar merchants and bring its business model in-store. Visa responded by restricting ACH transactions for all customers who had Visa-branded cards in their PayPal wallets.

150.    Visa relaxed these restrictions in 2021 but required continued information sharing. It continues to use this information sharing to monitor PayPal's product performance. Moreover, consumers may only use PayPal's in-store ACH option if they first scan a merchant's QR code and then connect to PayPal to approve the transaction, a significant friction limiting the use of PayPal as an in-store Visa alternative.

42

151.    Due to Visa's continued control of the debit market and its threat of crippling wallet fees, PayPal still has little choice but to acquiesce to Visa's demands. PayPal and Visa entered a new 10-year contract in 2022, under which PayPal is required to route 100% of its Visa-eligible volume to Visa from years four to ten. The contract also includes a) penalties if PayPal does not convert its co-branded debit cards to Visa; b) preservation of Visa's "customer choice" provisions that preference Visa payments over alternatives; and c) a requirement that PayPal participate in specified Visa programs and services.

152.    Visa has explicitly used the threat of a staged wallet fee to intimidate other would-be competitors into compliance. Visa views the fee as designed to prevent staged wallet operators from disintermediating Visa, and it waives the fee if the wallet agrees to Visa's terms. These threatened fees operate to extract agreements not to compete; any wallet that fails to comply will pay a targeted penalty that makes competition unprofitable. Since 2016, every staged wallet that has faced Visa's threatened fees has signed a deal rather than compete.

153.    Similarly, Visa has contracted with Square to prevent Square from seriously competing with Visa or developing a viable payment alternative. Square launched Square Cash—now called Cash App—to facilitate peer-to-peer payment. Square sought to facilitate debit payments between users while avoiding additional Visa fees, which led Visa to worry that Square was planning to build an ACH option if Visa did not contract directly with Square.

154.    A peer-to-peer ACH routing option posed a threat to Visa's debit payment volume—particularly because, once Square acquired a critical mass of bank account credentials from person-to-person transactions, it could use this information to launch a consumer-to-merchant debit competitor. To foreclose this possibility, Visa offered not to charge high rates to

Square Cash for debit transactions on Visa's network, but in exchange it required that it have the right to terminate the contract for convenience if Square began competing with Visa.

155.    In Visa's view, this deal provided two core benefits: (1) Square's commitment to route its debit volume through Visa, and (2) non-disintermediation. Visa signed its first contract with Square in 2014, after which Visa believed it had succeeding in protecting itself against disintermediation by Square.

156.    When Square announced a new product, called "Cash Drawer," in 2016, Visa again acted quickly to neutralize any threat. Like PayPal and its peer-to-peer platform Venmo, Cash Drawer permitted users to store funds in their Square Cash account. Visa feared that Cash Drawer presented a greater disintermediation threat to its debit dominance, so it sent a letter of intent to terminate its Square contract. Visa informed Square that Cash Drawer was a problem because Visa viewed a staged wallet as opposed to the model that Visa and Square had worked together on. In response, Square quickly removed the feature, rather than face the possibility of higher fees and penalties on Visa debit transactions, and Visa did not terminate the contract.

157.    Next, in 2021,[5] Square launched Cash App Pay to enable customers to purchase directly from merchants with Cash App. Because Cash App Pay would have triggered Visa's staged wallet fees, Square asked Visa to waive the fees. Visa recognized that Cash App Pay could threaten disintermediation, but also that Visa could threaten fees to provide leverage in a negotiation. In 2023, Visa used this leverage to enter into an agreement with Square to send 97% of Cash App Pay transactions over Visa's rails. The agreement additionally provided that Cash App Pay would preference Visa in its signup process and would not steer customers to ACH.

### iii.    Visa Uses Its Monopoly Profits to Pay off Potential Competitors and Extract Commitments Not to Compete

---

[5] https://squareup.com/us/en/press/cash-app-pay.

44

158.    Visa's monopoly power allows it to prevent competition even from would-be competitors that do not operate staged wallets. Because many of these potential competitors—including Big Tech behemoths like Google and Apple—are also Visa customers, Visa can use its usual threats of high rack rates, fees, and penalties to extract concessions that entrench Visa's market position. In addition, Visa uses some of its exorbitant monopoly profits to pay off these potential benefits and secure its continuing supracompetitive margins.

159.    For the most powerful players in Big Tech, Visa designs custom packages that trade incentive arrangements on Visa-eligible debit transactions for agreements not to disintermediate or compete with Visa, which amount to a form of horizontal product market division. Indeed, Visa knows that incentive arrangements with Apple and Amazon are not focused on routing. Due to the continuing monopoly profits these agreements allow, Visa will sometimes enter contracts where it makes less money than it would in a worse case scenario. As a result, for Big Tech entities such as Google and Apple, Visa retains dominance of their debit acceptance and online transactions.

160.    Visa's deals with Apple provide one such example: Apple has agreed not to create or launch any payment product with the intent of competing with Visa, including by developing a functionality that relies primarily on non-Visa processes or products, nor to provide incentives that intend to disintermediate Visa or encourage customers not to use Visa cards. Visa has extracted this concession by sharing its monopoly profits with Apple—including hundreds of millions of dollars of payments to Apple in 2023 alone—and by reducing Apple's merchant fees in exchange for a guarantee that Apple will not steer customers to alternative payment methods like ACH or introduce an alternative payment technology that disintermediates Visa. The benefit of this arrangement was that Apple's debit volume would remain on Visa.

45

161.    Visa has responded to Apple's competitive threat by asking itself whether to partner with Apple, and if so how to do so. For years, Visa has decided that insulating its dominance by sharing its monopoly profits is superior to risking a competitive market. Today, Visa continues to insist that Apple maintain its non-competitor status as a condition of their agreement. Visa feared, in 2022, that the parties' relationship comprised a tipping point due to Apple's continued inroads into traditional debit card networks. Due to the threat that Apple and, in particular, its popular Apple Pay digital wallet posed to Visa's dominance and profits, Visa chose to align its incentives with Apple. Through hundreds of millions of dollars of annual incentive payments, Visa ensures that Apple does not compete with it for debit network transactions.

## VII.    ANTICOMPETITIVE EFFECTS

162.    Visa has maintained its monopoly position in the debit market through years of anticompetitive conduct. By imposing exclusionary and anticompetitive contracts on issuers, acquirers, merchants, would-be competitors, and other industry participants, and by wielding the influence provided by its control over non-contestable transactions, Visa prevents competition for transactions that should be contested and stymies competition for presently non-contestable transactions before it can arise.

163.    If not for this network of anticompetitive contracts on both sides of the debit market, PIN networks such as Mastercard's Maestro and other back-of-card competitors would have the opportunity to achieve the necessary scale to compete with Visa's dominance, providing banks and merchants with multiple viable options. Similar, if not for Visa's anticompetitive contracts with potential fintech competitors, those companies would be incentivized to compete with Visa and/or offer innovative alternatives, to which Visa would be incentivized to react with advancements or innovations of its own. The result would be more choices and superior features

for consumers and businesses alike. This means that Visa's conduct had the effect of stifling competition from current and would-be competitors, leading to higher fees and inferior services.

164.    By using its two-sided dominance to foreclose would-be competitors from both the consumer and merchant sides of the debit market, Visa ensures that its rivals cannot reach the scale necessary to meaningfully compete for market share. This circumvention of the competitive process prevents all market participants—banks, merchants, and consumers—from achieving the benefits that competition provides.

165.    This conduct results in an anticompetitive feedback loop that further entrenches Visa's monopoly. Visa's exclusionary agreements on both sides of the market prevent rivals from reaching adequate scale to effectively compete. By securing debit volume through agreements that restrict competition on both sides of the market, Visa denies rivals the scale they need to present effective competition both now and in the future. As a result, competing networks have limited ability to vie on price and quality (e.g., fraud detection) today. Visa's agreements also restrict how much additional volume rival networks can gain if they reduce prices or develop new benefits. This reduces the incentive for PIN networks to lower prices or invest in innovative features. Weakening its rivals not only protects Visa from current competition for transactions that should be contested, but also diminishes the likelihood that these rivals can provide the features necessary to challenge Visa's dominance over non-contestable transactions later, such as the further development of PINless routing.

166.    Visa's exclusionary and anti-competitive practices have also stifled beneficial innovation. For over a decade, Visa has sought to delay or prevent the development of fintech network services that could offer Americans new payment methods directly from their bank accounts. This has likely slowed or blocked the introduction of features like staged digital wallets,

47

store credit or discount offers in digital wallets, and other functionalities that would enhance convenience and security while fostering closer merchant-consumer relationships. Visa's efforts have not only hampered innovation from other companies that could benefit consumers and businesses today, but also reduced Visa's own motivation to innovate: the company admitted that it has made no significant investments in innovation in the past decade, aside from its tokenization efforts.

167.    Robust competition should act as a check on Visa's pricing and stimulate its investments in innovation and benefits for customers and American consumers. However, this kind of vigorous competition is precisely what Visa has sought to avoid. Visa insulates its debit transaction volume from competition whenever possible, sometimes by preventing rivals from effectively competing for market shares and other times by diminishing incentives to compete through the imposition of fees or financial incentives. Visa's conduct further suppresses the motivation of current and potential rivals—as well as its own—to compete and innovate.

168.    It should be competition, not Visa, that determines how issuers, acquirers, merchants, and consumers interact. Competition, not Visa, should set the fees paid by these market participants, either directly or indirectly, to debit networks. Likewise, competition, not Visa, should drive the pace of innovation from both its competitors and Visa itself, providing consumers, merchants, acquirers, and issuers with valuable features and services in the market for debit transactions.

169.    Visa has effectively achieved its objective: to capture a substantial volume of contestable transactions through anti-competitive means, maintain or expand the pool of non-contestable transactions, thwart competitive threats from current and potential rivals, and benefit from its resulting monopoly. Since the Durbin Amendment was enacted, PIN networks have tried

48

to challenge Visa's dominance. For instance, in the early years following the amendment, Mastercard launched a PINless program for Maestro targeting Visa-branded debit cards. However, these gains were short-lived. Visa consistently leveraged its massive scale and substantial volume of non-contestable transactions to penalize disloyalty from merchants, acquirers, and issuers, to the detriment of competitors, consumers, merchants, and other market participants. Visa, by its own admission, continues to prevail despite PIN networks generally offering lower prices.

## VIII.    NO COUNTERVAILING FACTORS

170.    Visa's exclusionary behavior lacks any legitimate, procompetitive advantages that could outweigh the harm it inflicts on competition, nor are there benefits that could not be realized through less restrictive alternatives. The anticompetitive clauses in Visa's contracts, along with its related actions, are not essential to safeguard its technology, promote customer expansion, deter free-riding, or accomplish any other purported advantage. Visa has the ability to pursue any valid procompetitive goals without resorting to the restrictive terms being contested in this case, or could otherwise achieve those benefits through less limiting methods. Furthermore, Visa's agreements with existing and potential direct competitors do not function as mere adjuncts to its vertical relationships; rather, they act as clear divisions within the relevant markets among direct competitors.

## IX.    RELEVANT DEBIT MARKETS

171.    To identify the areas of commerce and competition affected by alleged anticompetitive actions, courts define what constitutes a relevant market, considering both product and geographic dimensions. Multiple relevant markets may encompass the same or similar goods and services, and these markets do not need to have strict boundaries.

49

172.    When analyzing Visa's unlawful, exclusionary conduct, there are two pertinent markets. One is the market for general-purpose debit network services within the United States. The other, narrower market is that of general-purpose card-not-present debit network services, which falls within the broader market of general-purpose debit network services in the United States.

### a.  The United States as a Relevant Geographic Market

173.    The United States represents a relevant geographic market. Federal regulations and laws governing debit transactions, including card-not-present transactions, operate on a nationwide level. Visa structures its U.S. debit business accordingly, as seen in its distinct rules for merchant acceptance in the U.S. and its unique pricing for debit services, including card-not-present transactions, tailored for merchants, acquirers, and issuers in the country. The primary participants in debit transactions—consumers, issuers, acquirers, and merchants—cannot realistically turn to network services outside of the United States as viable alternatives. Consequently, a company serving as the sole provider of general-purpose debit network services or card-not-present debit network services within the United States would have the power to sustain prices above those typical in a competitive marketplace.

### b.  Relevant Product Markets

174.    Two primary product markets are relevant here: (1) general-purpose debit network services; and (2) general-purpose card-not-present debit network services.

### i.  General-Purpose Debit Network Services as a Relevant Product Market

175.    General-purpose debit network services facilitate direct withdrawals from a consumer's bank account using a credential or account number. Visa, along with its competitors in the debit card network and fintech sectors, provides products and services that enable debit

50

transactions. They compete to offer these network services on a broad scale, meaning their credentials can be used at numerous unrelated merchants. These networks simultaneously market their services to issuers and acquirers or, in the case of some alternative networks, to accountholders and merchants. Acting as intermediaries, they operate two-sided platforms, allowing transactions between merchants and accountholders. Collectively, these services represent a relevant product market.

176.    Debit networks, such as Visa, offer a suite of services essential for executing debit transactions, consumed jointly by merchants and accountholders (alongside acquirers and issuers). These include the capacity for consumers or their banks to dispute and chargeback transactions, payment guarantees for merchants, fraud protection, and the "rail" that facilitates communication between parties, transferring funds from a consumer's bank to a merchant's account. These fundamental attributes distinguish debit transactions from other payment methods and are crucial for merchants, consumers, and banks alike. Although accountholders do not directly contract with Visa, both they and their banks depend on Visa and similar networks to enable transactions with merchants.

177.    Debit networks function as two-sided platforms with high interdependence between accountholders and issuers on one side and merchants and acquirers on the other. The network becomes more valuable to accountholders and issuers as it connects with more merchants, and likewise, it becomes more beneficial to merchants and acquirers when it links to more accountholders.

178.    Under antitrust laws, general-purpose debit network services form a relevant product market. Many consumers do not consider other payment options as suitable substitutes for debit. Recognizing their account holders' preference for debit, issuers also do not see alternative

payment services as viable replacements. Merchants value debit because they do not wish to lose sales by refusing to accept a widely preferred payment method. Acquirers, aware of their merchants' reliance on debit, similarly do not view alternative payment services as suitable substitutes. Therefore, there are no reasonable substitutes for general-purpose debit network services, and a single firm dominating this market could set prices above competitive levels.

179.    The market for general-purpose debit network services encompasses offerings from both traditional debit card networks and fintech debit networks. These fintech networks are accepted by all participating merchants, providing payment guarantees, dispute resolution, and fraud protection. In fintech-processed debit transactions, consumers do not possess a traditional "debit card," nor is there an "issuer" of a physical or virtual card. However, the functionalities provided by these fintech networks are equivalent for consumers and merchants.

180.    General-purpose credit card network services are not directly interchangeable with debit services, as debit payments draw directly from a consumer's bank account rather than a line of credit. Visa describes debit as a "pay now" product, while credit is characterized as "pay later." This distinction is well-acknowledged in the payments industry, and Visa, along with other networks, has separate pricing for credit and debit transactions. Additionally, regulations like the Durbin Amendment, which limits issuer fees, do not apply to credit. Many accountholders either do not qualify for credit cards or strongly prefer using their existing funds over incurring debt, making issuers unlikely to substitute credit for debit.

181.    Store cards and prepaid card network services do not serve as practical substitutes for debit network services. Visa itself views prepaid cards as complements to other card products. Since prepaid cards are not connected to a consumer's bank account, spending is limited to the

52

preloaded amount. Visa terms prepaid as a "pay before" product in contrast to debit's "pay now" function, and it prices prepaid services differently for merchants, acquirers, and issuers.

182.    Basic ACH transfers provided by entities like The Clearing House or the Federal Reserve are commonly used for specific payments, such as payroll, interbank settlements, or recurring payments, but are not generally interchangeable with most debit transactions. ACH transfers lack convenience, requiring consumers to input their bank details and verify their account for each merchant, often taking hours or days. Merchants also face delays and greater fraud risk with ACH transfers. Moreover, these transfers do not include guaranteed payment or dispute resolution, unlike debit services. Newer instant payment services, such as FedNow, would need additional services, including fraud detection, to be viable alternatives to debit.

183.    Cash and checks do not offer a reasonable substitute for debit network services. Merchants and accountholders alike do not view cash or check payments as equivalent to debit transactions due to the differences in processing procedures and costs.

### ii.  General-Purpose Card-Not-Present Debit Network Services as a Relevant Product Market

184.    While general-purpose debit network services cover all debit transactions, industry participants, including Visa, identify narrower submarkets within this broader category. One such market is the general-purpose card-not-present debit network services, which primarily caters to e-commerce.

185.    This market includes both traditional debit card and fintech debit transactions, enabling consumers to pay various merchants directly from their bank accounts.

186.    General purpose card-not-present debit networks services is also a relevant product market under the antitrust laws. Market participants do not find other payments services to be a reasonable substitute for card-not-present debit. In fact, there are particularly few even potential

alternatives to card-not-present debit transactions, given that cash is not an option in online and other card-not-present situations. There are no reasonable substitutes for card-not-present debit. A firm that was the only seller of general purpose card-not-present debit network services could raise and maintain prices above the level that would apply in a competitive market.

## X.    VISA HAS MONOPOLY POWER IN THE U.S. DEBIT MARKETS

187.    Visa holds a monopolistic position in the markets for general-purpose debit network services and general-purpose card-not-present debit network services within the United States, with market shares exceeding 60% and 65%, respectively, based on payment volume. Mastercard, the second-largest debit network in the country, processes less than 25% of debit transactions in either of these markets. No other competitor holds more than a single-digit percentage of transactions in these markets.

188.    Visa's monopoly power in the relevant debit markets stems from its ability to manipulate prices and suppress competition.

189.    Visa has managed to maintain monopoly-level pricing, as evidenced by its exceptionally high profit margins. Its operating margin in North America is an impressive 83%, with the U.S. debit business being its most significant contributor. These margins far exceed Visa's already high global margins reported since it went public in 2007, and they are also substantially higher than those of most other publicly traded companies.

190.    Visa has effectively blocked competition in both markets, as demonstrated by its consistently high market shares that have remained intact despite regulatory shifts. Following a brief adjustment period when the Durbin Amendment came into effect in 2012, Visa's market share has only grown over the past decade. Although Visa's share dropped from about 63% of debit payment volume in 2011 to roughly 56% in 2012 immediately after the Durbin Amendment's implementation, Visa had already begun countermeasures. In preparation for the amendment, Visa

54

started signing contracts with merchants and acquirers, ensuring that almost all of their Visa-eligible debit volume was routed to Visa. Within a few years, Visa not only recovered its former market share but also solidified it further. Visa has since continued to use similar tactics whenever faced with threats to its market dominance.

191.    Similarly, even with the recent clarification under Regulation II requiring issuers to enable at least one network unaffiliated with the front-of-card network for card-not-present transactions, Visa's market share remains unaffected.

192.    In addition to its high profit margins and sustained market share, other factors further confirm Visa's monopoly power.

193.    Unlike the smaller PIN networks, Visa and Mastercard are accepted by virtually every U.S. merchant that processes debit payments, regardless of whether the majority of their revenue comes from card-present or card-not-present transactions. Merchants consider both Visa and Mastercard indispensable, accepting both networks to maximize sales opportunities, no matter which debit cards customers use. This dynamic gives Visa considerable leverage over merchants. Unlike more competitive markets, merchants cannot simply abandon Visa when faced with price hikes or unfavorable terms. Additionally, debit networks face obstacles to market entry and growth, such as regulation and brand recognition.

194.    Merchants and acquirers are more inclined to absorb the costs of enabling and complying with networks that handle a large enough volume to justify the expenditure. Similarly, issuers prefer to enable networks widely accepted by merchants. Visa recognizes that its smaller rivals lack the necessary scale—wide enablement by issuers and acceptance by merchants. The market's two-sided nature makes it difficult to gain widespread enablement without already having

broad acceptance, creating a feedback loop known as network effects, as explained above. This need for scale poses a significant barrier to both market entry and expansion.

195.    Banks generally issue debit cards associated with only one front-of-card network, typically signing long-term agreements with either Visa or Mastercard and rarely switching between the two due to the costs and consumer disruption involved. These switching costs further entrench Visa's dominance, limiting Mastercard's growth and hindering potential front-of-card competitors from entering or expanding in the market.

196.    Visa is aware of these barriers, including switching costs and network effects, and actively exploits them to fend off rival networks and potential competitors that might disrupt its grip on U.S. debit markets. For instance, in 2023, Visa warned issuers they could face financial penalties if they enabled new features from competing PIN networks that led to a reduction in Visa's debit network volume. At that time, new Federal Reserve regulations required issuers to support at least two unaffiliated networks for card-not-present transactions. Many issuers had previously relied solely on front-of-card networks—either Visa or Mastercard—to process these transactions. Concerned that merchants and acquirers might finally adopt competitors' PINless capabilities, Visa began urging issuers to disable PINless functions for card-present transactions. The approved talking points included a reminder that enabling card-present PINless could result in higher fees and other penalties for the issuing partner. These penalties would act as an indirect price increase for issuers, one they could not easily avoid due to network-switching costs. This tactic allows Visa to expand its set of non-contestable transactions, which it then uses to impose penalties for what it deems disloyalty.

56

197.    Visa has the capability to set prices with little regard for its actual costs. It also practices price discrimination across different industry groups, with such pricing differences unrelated to the costs of providing services.

198.    Furthermore, Visa has been able to introduce new, less favorable pricing models without losing debit volume. In 2012, Visa rolled out its monthly Fixed Acquirer Network Fee (FANF) across all merchants and acquirers. More recently, in October 2023, Visa implemented a mandatory Digital Commerce Service fee, which bundled several previously optional value-added services fees into one for card-not-present transactions. Visa projects nearly five times the net revenue from this new mandatory fee compared to the previously optional fees. Despite imposing this new charge on merchants through their acquirers, Visa was confident it would not lose transactions.

## XI.    CLASS ALLEGATIONS

199.    Plaintiff brings this action on behalf of itself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure as representative of a class defined as follows:

> All persons, businesses, and other entities in the United States that both (1) have accepted general-purpose Visa-Branded Debit Cards[6]

---

[6] "Visa-Branded Debit Card" means any Debit Card that bears or uses the name Visa, Plus, Interlink, or any other brand name or mark owned or licensed for use by Visa, or that is issued under any such brand or mark. "Debit Card" means any card, plate, or other payment code, device, credential, account, or service, even where no physical card is issued and the code, device, credential, account, or service is used for only one transaction or multiple transactions — including, without limitation, a plastic card, a mobile telephone or other mobile communications device, a fob, a home assistant or other internet-connected device, or any other current or future code, device, credential, account, or service by which a person, business, or other entity can pay for goods or services — that is issued or approved for use through a payment network to debit an asset or deposit account, or that otherwise is not a Credit Card, regardless of whether authentication is based on signature, personal identification number (or PIN), or other means (or no means at all), and regardless of whether or not the issuer holds the account (such as decoupled debit).

57

during the period from October 1, 2020 through the present, and (2) did not accept Visa-Branded Cards or Mastercard-Branded Cards prior to January 25, 2019.[7]

200.   Excluded from the proposed class are Visa; Visa's affiliates and subsidiaries; Visa's current or former employees, officers, directors, agents, and representatives; the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members; counsel to Plaintiff and the proposed classes, as well as counsel's employees; and all governmental entities.

201.   On information and belief, hundreds of thousands of entities in the United States have contracted with Visa acquirers to accept Visa-branded general purpose debit cards during the relevant period. Thus, the class is so numerous and geographically dispersed that joinder is impracticable.

202.   Plaintiff's claims are typical of those of the class.

203.   Plaintiff and all members of the class suffered the same injuries—supracompetitive fees and reduced output—as a result of Visa's conduct.

204.   Plaintiff will fairly and adequately protect and represent the interests of the class. The interests of Plaintiff are not antagonistic to the class.

205.   Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

---

[7] The Class Definition uses "Visa-Branded Cards" and "Mastercard-Branded Cards" as those terms are defined in the Superseding and Amended Class Settlement Agreement of the Rule 23(b)(3) Class Plaintiffs and the Defendants in Case No. 05-MD-1720 (E.D.N.Y.), ECF No. 7257-2. Under that Agreement, "Visa-Branded Card" means any Credit Card or Debit Card that bears or uses the name Visa, Plus, Interlink, or any other brand name or mark owned or licensed for use by Visa, or that is issued under any such brand or mark. "Mastercard-Branded Card" means any Credit Card or Debit Card that bears or uses the name Mastercard, Maestro, Cirrus, or any other brand name or mark owned or licensed by Mastercard, or that is issued under any such brand or mark.

58

206.    Questions of law and fact common to the members of the class predominate over questions, if any, that may affect only individual members because Visa has acted and refused to act on grounds generally applicable to the entire class. Such generally applicable conduct is inherent in Visa's exclusionary and anticompetitive conduct, as more fully alleged herein.

207.    Questions of law and fact common to the class include:

a.  Whether Visa intentionally and unlawfully impaired or impeded competition in the relevant market;

b.  Whether Visa maintained or enhanced monopoly power in the relevant market;

c.  Whether Visa engaged in anticompetitive conduct in order to disadvantage competitors and dissuade competition to maintain monopoly power in the relevant market;

d.  Whether Visa had monopoly power in the relevant market;

e.  Whether Visa had procompetitive reasons for its conduct;

f.  The effects of Visa's anticompetitive conduct on network fees, interchange fees, and retail prices;

g.  Whether Plaintiff and class members have been overcharged and thus damaged as a result of Visa's unlawful behavior; and

h.  The proper measure of damages.

208.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would entail. The benefits of proceeding through the class mechanism, including providing injured

59

persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

209.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action as a class action.

## XII.    CONTINUING VIOLATION

210.    Plaintiff's claims are timely under the continuing violations doctrine. Visa's anticompetitive and unlawful conduct has continued within the applicable limitations period. Visa has taken acts during the Class Period to maintain and attempt to maintain its monopoly, including negotiating volume commitment agreements that prevent merchants and acquirers from routing debit transactions away from Visa. Visa has also entered into anticompetitive agreements with competitors or would-be competitors during the Class Period.

211.    As a result of Visa's anticompetitive conduct, throughout the Class Period and until the present, Visa imposed higher fees on Class Members than it would have been able to in a competitive market. Each debit transaction routed through Visa thus constituted a new overt act causing injury to the Class.

212.    Visa's unlawful conduct continues to this day.

213.    Plaintiff and the Class may recover damages suffered because of Visa's conduct during the Class Period.

## XIII.    CAUSES OF ACTION

214.    Plaintiff, on behalf of itself and members of the Class, pleads various causes of action under federal and state law.

215.    Visa's violations of law described below were flagrant and willful.

60

216.    Visa's conduct substantially affected the trade and commerce of each State under which Plaintiff brings a cause of action.

217.    Plaintiff and members of the Class have been injured in their business and property by reason of Visa's unlawful conduct by, *inter alia*, paying higher fees than they would have absent Visa's anticompetitive actions. Members of the Class have been injured in each State under which Plaintiff brings a cause of action.

218.    Plaintiff has provided contemporaneous notice to the attorneys general of the following states in filing this complaint: Arizona, California, Connecticut, Hawaii, Illinois, Kansas, Massachusetts, Minnesota, Mississippi, Nevada, New York, Rhode Island, Utah, Vermont, West Virginia, and Wisconsin.

### Count 1: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in the United States, Section 2 of the Sherman Act, 15 U.S.C. § 2

219.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

220.    Visa has monopolized, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

221.    Visa has monopoly power in both relevant markets.

222.    Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

223.    Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

224.    There are no procompetitive justifications for Visa's conduct that offset the harm caused by Visa's anticompetitive and illegal conduct.

225.    Plaintiff and other members of the Class have been injured in their businesses and property by paying more for fees on debit card transactions than they would have in the absence of Visa's willful and unlawful maintenance of its monopoly in the relevant markets.

**Count 2: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in the United States, Section 2 of the Sherman Act, 15 U.S.C. § 2**

226.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

227.    Visa has attempted to monopolize, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

228.    Visa has monopoly power or the dangerous probability of obtaining monopoly power in both relevant markets.

229.    Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has

62

harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

230.    When engaging in the conduct described in the Complaint, Visa acted with specific intent to monopolize each relevant market in the United States. Each of Visa's actions was specifically intended to monopolize each relevant market in the United States, and its actions collectively were specifically intended to achieve the same result. Visa intended to monopolize each relevant market by eliminating meaningful competition through the acts described in the Complaint. Unless Visa's conduct is prohibited, there is a dangerous probability that Visa will succeed in monopolizing each market in the United States, in violation of the Sherman Act.

231.    There are no procompetitive justifications for Visa's conduct that offset the harm caused by Visa's anticompetitive and illegal conduct.

232.    Plaintiff and other members of the Class have been injured in their businesses and property by paying more for fees on debit card transactions than they would have in the absence of Visa's willful and unlawful attempt to monopolize the relevant markets.

**Count 3: Unlawful Agreements Not to Compete, Section 1 of the Sherman Act, 15 U.S.C. § 1**

233.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

234.    Visa agreed with competitors and potential competitors not to compete. These agreements unreasonably restrain competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in two relevant markets related to debit transactions in the United States: (1) the

63

market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

235.    Visa has market power in both relevant markets.

236.    Visa agreed to pay its competitors and potential competitors Apple, PayPal, and Square not to compete in each relevant market. Visa's agreements reduce or eliminate competition from these competitors and potential competitors, who would otherwise compete with Visa's debit network and challenge Visa's debit network dominance. Visa thus limits competition and unreasonably restrains trade in each relevant market. In contrast to a more competitive market, Visa raises barriers to competition by current and potential competitors, imposes supracompetitive prices, stabilizes those prices, limits price competition, restricts output and other services, and limits innovation.

237.    Visa's agreements are not reasonably necessary to achieve any procompetitive goals. To the extent the agreements have any procompetitive benefits, they are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa could achieve those procompetitive benefits.

238.    Plaintiff and other members of the Class have been injured in their businesses and property by paying more for fees on debit card transactions than they would have in the absence of Visa's unlawful agreements not to compete.

**Count 4: Unlawful Agreements That Restrain Trade, Section 1 of the Sherman Act, 15 U.S.C. § 1**

239.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

240.    Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in two relevant markets

64

related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

241.    Visa has market power in each relevant market.

242.    Visa's agreements with merchants, issuers, and acquirers include (1) penalties, (2) cliff pricing terms, (3) volume commitments, and (4) other terms that unreasonably restrain competition by, among other things, foreclosing a substantial share of each relevant market. Visa's agreements stifle competition and limit potential rivals from challenging Visa's dominance, thereby impeding competition and unreasonably restraining trade in each relevant market. Visa's agreements raise barriers to competition by current and potential competitors, impose supracompetitive prices, stabilize those prices, limit price competition, restrict output and other services, and limit innovation.

243.    Visa's agreements are not reasonably necessary to achieve any procompetitive goals. To the extent the agreements have any procompetitive benefits, they are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa could achieve those procompetitive benefits.

244.    Plaintiff and other members of the Class have been injured in their businesses and property by paying more for fees on debit card transactions than they would have in the absence of Visa's unlawful agreements that restrain trade in the relevant markets.

**Count 5: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, et seq. (with respect to Class Members' Purchases in Arizona)**

245.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

246.    In violation of Ariz. Rev. Stat. § 44-1403, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

247.    Visa's violations of Arizona law were flagrant and willful.

248.    The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1403.

**Count 6: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, et seq. (with respect to Class Members' Purchases in Arizona)**

249.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

250.    In violation of Ariz. Rev. Stat. § 44-1403, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

251.    Visa's violations of Arizona law were flagrant and willful.

252.    The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1403.

**Count 7: Unlawful Agreements Not to Compete in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, et seq. (with respect to Class Members' Purchases in Arizona)**

66

253.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

254.    In violation of Ariz. Rev. Stat. § 44-1402, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

255.    Visa's violations of Arizona law were flagrant and willful.

256.    The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1402.

**Count 8: Unlawful Agreements That Restrain Trade in Violation of the Arizona Uniform State Antitrust Act, Ariz. Rev. Stat. §§ 44-1401, et seq. (with respect to Class Members' Purchases in Arizona)**

257.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

258.    In violation of Ariz. Rev. Stat. § 44-1402, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

259.    Visa's violations of Arizona law were flagrant and willful.

260.    The Class has been injured in its business or property in Arizona by Visa's violations of Ariz. Rev. Stat. § 44-1402.

**Count 9: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the**

67

**California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, et seq., and §§ 17200, et seq. (with respect to Class Members' Purchases in California)**

261.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

262.    Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, which constitute illegal "trusts" within the meaning of Cal. Bus. & Prof. Code § 16720. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

263.    Visa's violations of California law were flagrant and willful.

264.    The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

**Count 10: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, et seq., and §§ 17200, et seq. (with respect to Class Members' Purchases in California)**

265.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

266.    Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, which constitute illegal "trusts" within the meaning of Cal. Bus. & Prof. Code § 16720. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation,. Visa's acts,

68

individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

267.    Visa's violations of California law were flagrant and willful.

268.    The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

**Count 11: Unlawful Agreements Not to Compete in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, et seq., and §§ 17200, et seq. (with respect to Class Members' Purchases in California)**

269.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

270.    Visa entered into agreements that are illegal "trusts," within the meaning of Cal. Bus. & Prof. Code § 16720, by agreeing with its competitors and potential competitors Apple, PayPal, and Square not to compete in the relevant markets. These agreements constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of credit and charge card network services "shall be…controlled or established" (§16720(d)).

271.    Visa's violations of California law were flagrant and willful.

272.    The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

**Count 12: Unlawful Agreements That Restrain Trade in Violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, et seq., and §§ 17200, et seq. (with respect to Class Members' Purchases in California)**

273.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

274.    Visa entered into agreements with merchants, acquirers, and issuers that are illegal "trusts," within the meaning of Cal. Bus. & Prof. Code § 16720. These agreements constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of credit and charge card network services "shall be…controlled or established" (§16720(d)).

275.    Visa's violations of California law were flagrant and willful.

276.    The Class has been injured in its business or property in California by Visa's violations of Cal. Bus. & Prof. Code § 16720.

### Count 13: Violation of California's Unfair Competition Law

277.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

278.    Visa's conduct described above constitutes unfair, unlawful, or fraudulent business acts or practices as proscribed by California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL").

279.    Visa's conduct is unethical, unscrupulous, against public policy, and violates fundamental rules of honesty and fair dealing.

280.    Visa's conduct is unfair because it violates Section 2 of the Sherman Act, and the strong California public policy against monopoly.

281.    Visa's conduct is unlawful, as it violates the spirit and letter of Section 2 of the Sherman Act, and California's common law prohibition on monopolies.

282.    Plaintiff and members of the Class lost money because they paid inflated prices for Visa-processed debit transactions, and seek the full extent of restitution available under the UCL.

**Count 14: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, et seq. (with respect to Class Members' Purchases in Colorado)**

283.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

284.    In violation of Colo. Rev. Stat. § 6-4-105, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

285.    Visa's violations of Colorado law were flagrant and willful.

286.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-105.

**Count 15: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, et seq. (with respect to Class Members' Purchases in Colorado)**

287.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

288.    In violation of Colo. Rev. Stat. § 6-4-105, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts

described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

289.    Visa's violations of Colorado law were flagrant and willful.

290.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-105.

**Count 16: Unlawful Agreements Not to Compete in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, et seq. (with respect to Class Members' Purchases in Colorado)**

291.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

292.    In violation of Colo. Rev. Stat. § 6-4-104, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

293.    Visa's violations of Colorado law were flagrant and willful.

294.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-104.

**Count 17: Unlawful Agreements That Restrain Trade in Violation of the Colorado Antitrust Act, Colo. Rev. Stat. §§ 6-4-104, et seq. (with respect to Class Members' Purchases in Colorado)**

295.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

296.    In violation of Colo. Rev. Stat. § 6-4-104, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

297.    Visa's violations of Colorado law were flagrant and willful.

298.    The Class has been injured in its business or property in Colorado by Visa's violations of Colo. Rev. Stat. § 6-4-104.

**Count 18: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, et seq. (with respect to Class Members' Purchases in Connecticut)**

299.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

300.    In violation of Conn. Gen. Stat. §§ 35-27, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

301.    Visa's violations of Connecticut law were flagrant and willful.

302.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-27.

**Count 19: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, et seq. (with respect to Class Members' Purchases in Connecticut)**

303.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

304.    In violation of Conn. Gen. Stat. §§ 35-27, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

305.    Visa's violations of Connecticut law were flagrant and willful.

306.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-27.

**Count 20: Unlawful Agreements Not to Compete in Violation the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, et seq. (with respect to Class Members' Purchases in Connecticut)**

307.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

308.    In violation of Conn. Gen. Stat. §§ 35-26, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

309.    Visa's violations of Connecticut law were flagrant and willful.

310.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-26.

74

**Count 21: Unlawful Agreements That Restrain Trade in Violation the Connecticut Antitrust Act, Conn. Gen. Stat. §§ 35-24, et seq. (with respect to Class Members' Purchases in Connecticut)**

311.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

312.    In violation of Conn. Gen. Stat. §§ 35-26, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

313.    Visa's violations of Connecticut law were flagrant and willful.

314.    The Class has been injured in its business or property in Connecticut by Visa's violations of Conn. Gen. Stat. §§ 35-26.

**Count 22: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, et seq. (with respect to Class Members' Purchases in the District of Columbia)**

315.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

316.    In violation of D.C. Code §§ 28-4503, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

317.    Visa's violations of District of Columbia law were flagrant and willful.

318.    The Class has been injured in its business or property in the District of Columbia by Visa's violations of D.C. Code §§ 28-4503.

**Count 23: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, et seq. (with respect to Class Members' Purchases in the District of Columbia)**

319.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

320.    In violation of D.C. Code §§ 28-4503, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

321.    Visa's violations of District of Columbia law were flagrant and willful.

322.    The Class has been injured in its business or property in the District of Columbia by Visa's violations of D.C. Code §§ 28-4503.

**Count 24: Unlawful Agreements Not to Compete in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, et seq. (with respect to Class Members' Purchases in the District of Columbia)**

323.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

324.    In violation of D.C. Code §§ 28-4502, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

76

325.    Visa's violations of District of Columbia law were flagrant and willful.

326.    The Class has been injured in its business or property in the District of Columbia by Visa's violations of D.C. Code §§ 28-4502.

**Count 25: Unlawful Agreements That Restrain Trade in Violation of the District of Columbia Antitrust Act, D.C. Code §§ 28-4501, et seq. (with respect to Class Members' Purchases in the District of Columbia)**

327.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

328.    In violation of D.C. Code §§ 28-4502, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

329.    Visa's violations of District of Columbia law were flagrant and willful.

330.    The Class has been injured in its business or property in the District of Columbia by Visa's violations of Conn. Gen. Stat. §§ 35-26.

**Count 26: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq. (with respect to Class Members' Purchases in Florida)**

331.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

332.    In violation of Fla. Stat. § 501.204, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

333.    Visa's violations of Florida law were flagrant and willful.

77

334.    The Class has been injured in its business or property in Florida by Visa's

violations of Fla. Stat. § 501.204.

**Count 27: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq. (with respect to Class Members' Purchases in Florida)**

335.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

336.    In violation of Fla. Stat. § 501.204, Visa has attempted to monopolize each of the

relevant markets through the exclusionary course of conduct and anticompetitive acts described.

Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a

cumulative effect that has harmed competition in each relevant market, including raising barriers

to competition by current and potential competitors, imposing supracompetitive prices,

stabilizing those prices, limiting price competition, restricting output and other services, and

limiting innovation.

337.    Visa's violations of Florida law were flagrant and willful.

338.    The Class has been injured in its business or property in Florida by Visa's

violations of Fla. Stat. § 501.204.

**Count 28: Unlawful Agreements Not to Compete in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq. (with respect to Class Members' Purchases in Florida)**

339.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

340.    In violation of Fla. Stat. § 501.204, Visa agreed with competitors and potential

competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain

competition in two relevant markets related to debit transactions in the United States: (1) the

78

market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

341.     Visa's violations of Florida law were flagrant and willful.

342.     The Class has been injured in its business or property in Florida by Visa's violations of Fla. Stat. § 501.204.

**Count 29: Unlawful Agreements That Restrain Trade in Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq. (with respect to Class Members' Purchases in Florida)**

343.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

344.     In violation of Fla. Stat. § 501.204, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

345.     Visa's violations of Florida law were flagrant and willful.

346.     The Class has been injured in its business or property in Florida by Visa's violations of Fla. Stat. § 501.204.

**Count 30: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, et seq. (with respect to Class Members' Purchases in Hawaii)**

347.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

348.     In violation of Haw. Rev. Stat. § 480-9, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein. Visa's acts, individually and collectively, increased,

maintained, or protected its monopoly in both relevant markets.

349.    Visa's violations of Hawaii law were flagrant and willful.

350.    The Class has been injured in its business or property in Hawaii by Visa's

violations of Haw. Rev. Stat. § 480-9.

**Count 31: Attempted Monopolization of the Relevant Markets for General Purpose Debit
Network Services and General Purpose Card-Not-Present Debit Network Services in
Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, et seq. (with respect to
Class Members' Purchases in Hawaii)**

351.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

352.    In violation of Haw. Rev. Stat. § 480-9, Visa has attempted to monopolize each of

the relevant markets through the exclusionary course of conduct and anticompetitive acts

described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions

have a cumulative effect that has harmed competition in each relevant market, including raising

barriers to competition by current and potential competitors, imposing supracompetitive prices,

stabilizing those prices, limiting price competition, restricting output and other services, and

limiting innovation.

353.    Visa's violations of Hawaii law were flagrant and willful.

354.    The Class has been injured in its business or property in Hawaii by Visa's

violations of Haw. Rev. Stat. § 480-9.

**Count 32: Unlawful Agreements Not to Compete in Violation of the Hawaii Antitrust
Statute, Haw. Rev. Stat. §§ 480-1, et seq. (with respect to Class Members' Purchases in
Hawaii)**

355.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

80

356.    In violation of Haw. Rev. Stat. § 480-4, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

357.    Visa's violations of Hawaii law were flagrant and willful.

358.    The Class has been injured in its business or property in Hawaii by Visa's violations of Haw. Rev. Stat. § 480-4.

**Count 33: Unlawful Agreements That Restrain Trade in Violation of the Hawaii Antitrust Statute, Haw. Rev. Stat. §§ 480-1, et seq. (with respect to Class Members' Purchases in Hawaii)**

359.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

360.    In violation of Haw. Rev. Stat. § 480-4, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

361.    Visa's violations of Hawaii law were flagrant and willful.

362.    The Class has been injured in its business or property in Hawaii by Visa's violations of Haw. Rev. Stat. § 480-4.

**Count 34: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, et seq. (with respect to Class Members' Purchases in Illinois)**

363.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

81

364.    In violation of 740 Ill. Comp. Stat. 10/3, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa maintained monopoly power over a substantial part of trade or commerce of Illinois for the purpose of excluding competition and controlling, fixing, or maintaining prices in such trade or commerce.

365.    Visa's violations of Illinois law were flagrant and willful.

366.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**Count 35: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, et seq. (with respect to Class Members' Purchases in Illinois)**

367.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

368.    In violation of 740 Ill. Comp. Stat. 10/3, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation. Visa attempted to monopolize a substantial part of trade or commerce of Illinois for the purpose of excluding competition and controlling, fixing, or maintaining prices in such trade or commerce.

369.    Visa's violations of Illinois law were flagrant and willful.

370.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**Count 36: Unlawful Agreements Not to Compete in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, et seq. (with respect to Class Members' Purchases in Illinois)**

371.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

372.    In violation of 740 Ill. Comp. Stat. 10/3, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

373.    Visa made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged for any fee charged or paid for debit network services performed by the parties thereto in Illinois.

374.    Visa fixed, controlled or maintained the sale or supply of debit network services, for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged or paid for debit network services in Illinois.

375.    By contract, combination or conspiracy, Visa unreasonably restrained trade or commerce for debit network services in Illinois.

376.    Visa's violations of Illinois law were flagrant and willful.

377.    The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**Count 37: Unlawful Agreements That Restrain Trade in Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, et seq. (with respect to Class Members' Purchases in Illinois)**

378.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

379.     In violation of 740 Ill. Comp. Stat. 10/3, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

380.     Visa made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged for any fee charged or paid for debit network services performed by the parties thereto in Illinois.

381.     Visa fixed, controlled or maintained the sale or supply of debit network services, for the purpose or with the effect of fixing, controlling or maintaining the price or rate charged or paid for debit network services in Illinois.

382.     By contract, combination or conspiracy, Visa unreasonably restrained trade or commerce for debit network services in Illinois.

383.     Visa's violations of Illinois law were flagrant and willful.

384.     The Class has been injured in its business or property in Illinois by Visa's violations of 740 Ill. Comp. Stat. 10/3.

**Count 38: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, et seq. (with respect to Class Members' Purchases in Iowa)**

385.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

386.    In violation of Iowa Code §§ 553.5, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

387.    Visa's violations of Iowa law were flagrant and willful.

388.    The Class has been injured in its business or property in Iowa by Visa's violations of Iowa Code §§ 553.5.

**Count 39: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, et seq. (with respect to Class Members' Purchases in Iowa)**

389.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

390.    In violation of Iowa Code §§ 553.5, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

391.    Visa's violations of Iowa law were flagrant and willful.

392.    The Class has been injured in its business or property in Iowa by Visa's violations of Iowa Code §§ 553.5.

85

**Count 40: Unlawful Agreements Not to Compete in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, et seq. (with respect to Class Members' Purchases in Iowa)**

393.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

394.    In violation of Iowa Code §§ 553.4, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services. Visa entered into contracts, combinations and conspiracies with others that unreasonably restrained trade or commerce in the market for debit network services in Iowa.

395.    Visa's violations of Iowa law were flagrant and willful.

396.    The Class has been injured in its business or property in Iowa by Visa's violations of Iowa Code §§ 553.4.

**Count 41: Unlawful Agreements That Restrain Trade in Violation of the Iowa Competition Law, Iowa Code §§ 553.1, et seq. (with respect to Class Members' Purchases in Iowa)**

397.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

398.    In violation of Iowa Code §§ 553.4, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services. Visa entered into contracts, combinations and conspiracies with others that unreasonably restrained trade or commerce in the market for debit network services in Iowa.

86

399.     Visa's violations of Iowa law were flagrant and willful.

400.     The Class has been injured in its business or property in Iowa by Visa's violations

of Iowa Code §§ 553.4.

### Count 42: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, et seq. (with respect to Class Members' Purchases in Kansas)

401.     Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

402.     In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa has willfully and

unlawfully maintained its monopoly in the relevant markets through the exclusionary course of

conduct and anticompetitive acts described herein. Visa's acts, individually and collectively,

increased, maintained, or protected its monopoly in both relevant markets. Visa entered into

arrangements, contracts, agreements, trust or combinations between others made with a view

toward preventing or which tend to prevent full and free competition for the provision of debit

network services in Kansas.

403.     Visa's violations of Kansas law were flagrant and willful.

404.     The Class has been injured in its business or property in Kansas by Visa's

violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

### Count 43: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, et seq. (with respect to Class Members' Purchases in Kansas)

405.     Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

406.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa has attempted to

monopolize each of the relevant markets through the exclusionary course of conduct and

anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right.

Collectively, Visa's actions have a cumulative effect that has harmed competition in each

relevant market, including raising barriers to competition by current and potential competitors,

imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting

output and other services, and limiting innovation. Visa entered into arrangements, contracts,

agreements, trust or combinations between others made with a view toward preventing or which

tend to prevent full and free competition for the provision of debit network services in Kansas.

407.    Visa's violations of Kansas law were flagrant and willful.

408.    The Class has been injured in its business or property in Kansas by Visa's

violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

**Count 44: Unlawful Agreements Not to Compete in Violation of the Kansas Restraint of
Trade Act, Kan. Stat. Ann. §§ 50-101, et seq. (with respect to Class Members' Purchases in
Kansas)**

409.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

410.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa agreed with competitors

and potential competitors Apple, PayPal, and Square not to compete. These agreements

unreasonably restrain competition in two relevant markets related to debit transactions in the

United States: (1) the market for general purpose card-not-present debit network services, and (2)

the market for general purpose debit network services. Visa entered into arrangements, contracts,

agreements, trust or combinations between others made with a view toward preventing or which

tend to prevent full and free competition for the provision of debit network services in Kansas.

88

411.    Visa's violations of Kansas law were flagrant and willful.

412.    The Class has been injured in its business or property in Kansas by Visa's

violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

**Count 45: Unlawful Agreements That Restrain Trade in Violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, et seq. (with respect to Class Members' Purchases in Kansas)**

413.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

414.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Visa's agreements with

merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to

debit transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services. Visa entered

into contracts, combinations and conspiracies with others that unreasonably restrained trade or

commerce in the market for debit network services in Iowa. Visa entered into arrangements,

contracts, agreements, trust or combinations between others made with a view toward preventing

or which tend to prevent full and free competition for the provision of debit network services in

Kansas.

415.    Visa's violations of Kansas law were flagrant and willful.

416.    The Class has been injured in its business or property in Kansas by Visa's

violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

**Count 46: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)**

417.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

89

418.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1102, Visa has willfully and

unlawfully maintained its monopoly in the relevant markets through the exclusionary course of

conduct and anticompetitive acts described herein. Visa's acts, individually and collectively,

increased, maintained, or protected its monopoly in both relevant markets.

419.    Visa's violations of Maine law were flagrant and willful.

420.    The Class has been injured in its business or property in Maine by Visa's

violations of Me. Rev. Stat. Ann. tit. 10, § 1102.

**Count 47: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*. (with respect to Class Members' Purchases in Maine)**

421.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

422.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1102, Visa has attempted to

monopolize each of the relevant markets through the exclusionary course of conduct and

anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right.

Collectively, Visa's actions have a cumulative effect that has harmed competition in each

relevant market, including raising barriers to competition by current and potential competitors,

imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting

output and other services, and limiting innovation.

423.    Visa's violations of Maine law were flagrant and willful.

424.    The Class has been injured in its business or property in Maine by Visa's

violations of Me. Rev. Stat. Ann. tit. 10, § 1102.

**Count 48: Unlawful Agreements Not to Compete in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*. (with respect to Class Members' Purchases in Maine)**

425.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

426.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1101, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

427.    Visa's violations of Maine law were flagrant and willful.

428.    The Class has been injured in its business or property in Maine by Visa's violations of Me. Rev. Stat. Ann. tit. 10, § 1101.

**Count 49: Unlawful Agreements That Restrain Trade in Violation of Maine's Monopolies and Profiteering Law, Me. Rev. Stat. Ann. tit. 10, §§ 1101, *et seq.* (with respect to Class Members' Purchases in Maine)**

429.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

430.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1101, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

431.    Visa's violations of Maine law were flagrant and willful.

432.    The Class has been injured in its business or property in Maine by Visa's violations of Me. Rev. Stat. Ann. tit. 10, § 1101.

**Count 50: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the**

91

**Maryland Antitrust Act, Md. Code Com. Law § 11-201, *et seq.*, (with respect to Class Members' Purchases in Maryland)**

433.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

434.    In violation of Md. Code Com. Law § 11-204, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa has monopolized part of the trade or commerce within Maryland, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

435.    Visa's violations of Maryland law were flagrant and willful.

436.    The Class has been injured in its business or property in Maryland by Visa's violations of Md. Code Com. Law § 11-204.

**Count 51: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Maryland Antitrust Act, Md. Code Com. Law § 11-201, *et seq.*, (with respect to Class Members' Purchases in Maryland)**

437.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

438.    In violation of Md. Code Com. Law § 11-204, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and

92

limiting innovation. Visa has attempted to monopolize part of the trade or commerce within Maryland, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

439.    Visa's violations of Maryland law were flagrant and willful.

440.    The Class has been injured in its business or property in Maryland by Visa's violations of Md. Code Com. Law § 11-204.

**Count 52: Unlawful Agreements Not to Compete in Violation of the Maryland Antitrust Act, Md. Code Com. Law § 11-201, *et seq.*, (with respect to Class Members' Purchases in Maryland)**

441.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

442.    In violation of Md. Code Com. Law § 11-204, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

443.    Visa's violations of Maryland law were flagrant and willful.

444.    The Class has been injured in its business or property in Maryland by Visa's violations of Md. Code Com. Law § 11-204.

**Count 53: Unlawful Agreements That Restrain Trade in Violation of the Maryland Antitrust Act, Md. Code Com. Law § 11-201, *et seq.*, (with respect to Class Members' Purchases in Maryland)**

445.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

446.    In violation of Md. Code Com. Law § 11-204, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

447.    Visa's violations of Maryland law were flagrant and willful.

448.    The Class has been injured in its business or property in Maryland by Visa's violations of Md. Code Com. Law § 11-204.

**Count 54: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A § 1, *et seq.*, (with respect to Class Members' Purchases in Massachusetts)**

449.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

450.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets. Visa has monopolized part of the trade or commerce within Massachusetts, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

451.    Visa's violations of Massachusetts law were flagrant and willful.

452.    The Class has been injured in its business or property in Massachusetts by Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

**Count 55: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A § 1, *et seq.*, (with respect to Class Members' Purchases in Massachusetts)**

94

453.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

454.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation. Visa has attempted to monopolize part of the trade or commerce within Massachusetts, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce.

455.    Visa's violations of Massachusetts law were flagrant and willful.

456.    The Class has been injured in its business or property in Massachusetts by Visa's violations of Mass. Gen. Laws. Ch. 93A § 2.

**Count 56: Unlawful Agreements Not to Compete in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A § 1, *et seq.*, (with respect to Class Members' Purchases in Massachusetts)**

457.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

458.    In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

95

459.     Visa's violations of Massachusetts law were flagrant and willful.

460.     The Class has been injured in its business or property in Massachusetts by Visa's

violations of Mass. Gen. Laws. Ch. 93A § 2.

**Count 57: Unlawful Agreements That Restrain Trade in Violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws. Ch. 93A § 1,** *et seq.***, (with respect to Class Members' Purchases in Massachusetts)**

461.     Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

462.     In violation of Mass. Gen. Laws. Ch. 93A § 2, Visa's agreements with merchants,

issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services.

463.     Visa's violations of Massachusetts law were flagrant and willful.

464.     The Class has been injured in its business or property in Massachusetts by Visa's

violations of Mass. Gen. Laws. Ch. 93A § 2.

**Count 58: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771,** *et seq.***, (with respect to Class Members' Purchases in Michigan)**

465.     Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

466.     In violation of Mich. Comp. Laws Ann. § 445.773, Visa has willfully and

unlawfully maintained its monopoly in the relevant markets through the exclusionary course of

conduct and anticompetitive acts described herein. Visa's acts, individually and collectively,

increased, maintained, or protected its monopoly in both relevant markets.

467.     Visa's violations of Michigan law were flagrant and willful.

468.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.773.

**Count 59: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, (with respect to Class Members' Purchases in Michigan)**

469.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

470.    In violation of Mich. Comp. Laws Ann. § 445.773, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

471.    Visa's violations of Michigan law were flagrant and willful.

472.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.773.

**Count 60: Unlawful Agreements Not to Compete in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, (with respect to Class Members' Purchases in Michigan)**

473.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

474.    In violation of Mich. Comp. Laws Ann. § 445.772, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the

97

United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

475.    Visa's violations of Michigan law were flagrant and willful.

476.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.772.

**Count 61: Unlawful Agreements That Restrain Trade in Violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, (with respect to Class Members' Purchases in Michigan)**

477.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

478.    In violation of Mich. Comp. Laws Ann. § 445.772, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

479.    Visa's violations of Michigan law were flagrant and willful.

480.    The Class has been injured in its business or property in Michigan by Visa's violations of Mich. Comp. Laws Ann. § 445.772.

**Count 62: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49, *et seq.*, (with respect to Class Members' Purchases in Minnesota)**

470.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

471.    In violation of Minn. Stat. Ann. § 325D.52, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

472.    Visa's violations of Minnesota law were flagrant and willful.

473.    The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.52.

**Count 63: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49, *et seq.*, (with respect to Class Members' Purchases in Minnesota)**

474.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

475.    In violation of Minn. Stat. Ann. § 325D.52, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

476.    Visa's violations of Minnesota law were flagrant and willful.

477.    The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.52.

**Count 64: Unlawful Agreements Not to Compete in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49, *et seq.*, (with respect to Class Members' Purchases in Minnesota)**

478.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

99

479.    In violation of Minn. Stat. Ann. § 325D.51, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

480.    Visa's violations of Minnesota law were flagrant and willful.

481.    The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.51.

**Count 65: Unlawful Agreements That Restrain Trade in Violation of the Minnesota Antitrust Law, Minn. Stat. Ann. §§ 325D.49, *et seq.*, (with respect to Class Members' Purchases in Minnesota)**

482.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

483.    In violation of Minn. Stat. Ann. § 325D.51, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

484.    Visa's violations of Minnesota law were flagrant and willful.

485.    The Class has been injured in its business or property in Minnesota by Visa's violations of Minn. Stat. Ann. § 325D.51.

**Count 66: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.*, (with respect to Class Members' Purchases in Mississippi)**

486.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

100

487.    In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

488.    Visa's violations of Mississippi law were flagrant and willful.

489.    The Class has been injured in its business or property in Mississippi by Visa's violations of Miss. Code Ann. § 75-21-1, *et. seq*.

**Count 67: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.*, (with respect to Class Members' Purchases in Mississippi)**

490.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

491.    In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

492.    Visa's violations of Mississippi law were flagrant and willful.

493.    The Class has been injured in its business or property in Mississippi by Visa's violations of Miss. Code Ann. § 75-21-1, *et. seq*.

**Count 68: Unlawful Agreements Not to Compete in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.*, (with respect to Class Members' Purchases in Mississippi)**

101

494.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

495.    In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

496.    Visa's violations of Mississippi law were flagrant and willful.

497.    The Class has been injured in its business or property in Mississippi by Visa's violations of Miss. Code Ann. § 75-21-1, *et. seq.*

**Count 69: Unlawful Agreements That Restrain Trade in Violation of the Mississippi Antitrust Statute, Miss. Code Ann. §§ 75-21-3, *et seq.*, (with respect to Class Members' Purchases in Mississippi)**

498.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

499.    In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

500.    Visa's violations of Mississippi law were flagrant and willful.

501.    The Class has been injured in its business or property in Mississippi by Visa's violations of Miss. Code Ann. § 75-21-1, *et. seq.*

**Count 70: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the**

**Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.*, (with respect to Class Members' Purchases in Nebraska)**

470.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

471.    In violation of Neb. Code Ann. § 59-802, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

472.    Visa's violations of Nebraska law were flagrant and willful.

473.    The Class has been injured in its business or property in Nebraska by Visa's violations of Neb. Code Ann. § 59-802.

**Count 71: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.*, (with respect to Class Members' Purchases in Nebraska)**

474.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

475.    In violation of Neb. Code Ann. § 59-802, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

476.    Visa's violations of Nebraska law were flagrant and willful.

477.    The Class has been injured in its business or property in Nebraska by Visa's violations of Neb. Code Ann. § 59-802.

**Count 72: Unlawful Agreements Not to Compete in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.*, (with respect to Class Members' Purchases in Nebraska)**

478.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

479.    In violation of Neb. Code Ann. § 59-801, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

480.    Visa's violations of Nebraska law were flagrant and willful.

481.    The Class has been injured in its business or property in Nebraska by Visa's violations of Neb. Code Ann. § 59-801.

**Count 73: Unlawful Agreements That Restrain Trade in Violation of the Nebraska Junkin Act, Neb. Code Ann. §§ 59-801, *et seq.*, (with respect to Class Members' Purchases in Nebraska)**

482.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

483.    In violation of Neb. Code Ann. § 59-801, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

484.    Visa's violations of Nebraska law were flagrant and willful.

104

485.    The Class has been injured in its business or property in Nebraska by Visa's violations of Neb. Code Ann. § 59-802.

**Count 74: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, (with respect to Class Members' Purchases in Nevada)**

486.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

487.    In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in Nevada. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

488.    Visa's violations of Nevada law were flagrant and willful.

489.    The Class has been injured in its business or property in Nevada by Visa's violations of Nev. Rev. Stat. Ann. § 598A.060.

**Count 75: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, (with respect to Class Members' Purchases in Nevada)**

490.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

491.    In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in Nevada. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential

105

competitors, imposing supracompetitive prices, stabilizing those prices, limiting price

competition, restricting output and other services, and limiting innovation.

492.     Visa's violations of Nevada law were flagrant and willful.

493.     The Class has been injured in its business or property in Nevada by Visa's

violations of Nev. Rev. Stat. Ann. § 598A.060.

### Count 76: Unlawful Agreements Not to Compete in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, (with respect to Class Members' Purchases in Nevada)

494.     Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

495.     In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa agreed with competitors

and potential competitors Apple, PayPal, and Square not to compete, including in Nevada. These

agreements unreasonably restrain competition in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services.

496.     Visa's violations of Nevada law were flagrant and willful.

497.     The Class has been injured in its business or property in Nevada by Visa's

violations of Nev. Rev. Stat. Ann. § 598A.060.

### Count 77: Unlawful Agreements That Restrain Trade in Violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, (with respect to Class Members' Purchases in Nevada)

498.     Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

499.     In violation of Nev. Rev. Stat. Ann. § 598A.060, Visa's agreements with

merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to

106

debit transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services. Visa's

agreements unreasonably restrain trade in Nevada.

500.    Visa's violations of Nevada law were flagrant and willful.

501.    The Class has been injured in its business or property in Nevada by Visa's

violations of Nev. Rev. Stat. Ann. § 598A.060.

**Count 78: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq.*, (with respect to Class Members' Purchases in New Hampshire)**

502.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

503.    In violation of N.H. Rev Stat. Ann. § 356.3, Visa has willfully and unlawfully

maintained its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein. Visa's acts, individually and collectively, increased,

maintained, or protected its monopoly in both relevant markets.

504.    Visa's violations of New Hampshire law were flagrant and willful.

505.    The Class has been injured in its business or property in New Hampshire by

Visa's violations of N.H. Rev Stat. Ann. § 356.3.

**Count 79: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq.*, (with respect to Class Members' Purchases in New Hampshire)**

506.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

507.    In violation of N.H. Rev Stat. Ann. § 356.3, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

508.    Visa's violations of New Hampshire law were flagrant and willful.

509.    The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.3.

**Count 80: Unlawful Agreements Not to Compete in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq.*, (with respect to Class Members' Purchases in New Hampshire)**

510.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

511.    In violation of N.H. Rev Stat. Ann. § 356.2, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

512.    Visa's violations of New Hampshire law were flagrant and willful.

513.    The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.2.

**Count 81: Unlawful Agreements That Restrain Trade in Violation of the New Hampshire Antitrust Statute, N.H. Rev Stat. Ann. §§ 356.1, *et seq.*, (with respect to Class Members' Purchases in New Hampshire)**

514.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

515.     In violation of N.H. Rev Stat. Ann. § 356.2, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

516.     Visa's violations of New Hampshire law were flagrant and willful.

517.     The Class has been injured in its business or property in New Hampshire by Visa's violations of N.H. Rev Stat. Ann. § 356.2.

**Count 82: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, (with respect to Class Members' Purchases in New Mexico)**

518.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

519.     In violation of N.M. Stat. Ann. § 57-1-2, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in New Mexico. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

520.     Visa's violations of New Mexico law were flagrant and willful.

521.     The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-2.

**Count 83: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, (with respect to Class Members' Purchases in New Mexico)**

522.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

523.    In violation of N.M. Stat. Ann. § 57-1-2, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in New Mexico. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

524.    Visa's violations of New Mexico law were flagrant and willful.

525.    The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-2.

**Count 84: Unlawful Agreements Not to Compete in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, (with respect to Class Members' Purchases in New Mexico)**

526.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

527.    In violation of N.M. Stat. Ann. § 57-1-1, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in New Mexico. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

110

528.    Visa's violations of New Mexico law were flagrant and willful.

529.    The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-1.

**Count 85: Unlawful Agreements That Restrain Trade in Violation of the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1, *et seq.*, (with respect to Class Members' Purchases in New Mexico)**

530.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

531.    In violation of N.M. Stat. Ann. § 57-1-1, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services. Visa's agreements unreasonably restrained trade in New Mexico.

532.    Visa's violations of New Mexico law were flagrant and willful.

533.    The Class has been injured in its business or property in New Mexico by Visa's violations of N.M. Stat. Ann. § 57-1-1.

**Count 86: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, (with respect to Class Members' Purchases in New York)**

534.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

535.    In violation of N.Y. Gen. Bus. Law § 340, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through contracts, agreements, arrangement, or combination, including in New York. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

111

536.    Visa's violations of New York law were flagrant and willful.

537.    The Class has been injured in its business or property in New York by Visa's

violations of N.Y. Gen. Bus. Law § 340.

**Count 87: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, (with respect to Class Members' Purchases in New York)**

538.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

539.    In violation of N.Y. Gen. Bus. Law § 340, Visa has attempted to monopolize each

of the relevant markets through contracts, agreements, arrangement, or combination, including in

New York. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions

have a cumulative effect that has harmed competition in each relevant market, including raising

barriers to competition by current and potential competitors, imposing supracompetitive prices,

stabilizing those prices, limiting price competition, restricting output and other services, and

limiting innovation.

540.    Visa's violations of New York law were flagrant and willful.

541.    The Class has been injured in its business or property in New York by Visa's

violations of N.Y. Gen. Bus. Law § 340.

**Count 88: Unlawful Agreements Not to Compete in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, (with respect to Class Members' Purchases in New York)**

542.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

543.    In violation of N.Y. Gen. Bus. Law § 340, Visa agreed with competitors and

potential competitors Apple, PayPal, and Square not to compete. Visa entered into contracts,

agreements, arrangements, or combinations that have unreasonably restrained competition in New York and in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

544.     Visa's violations of New York law were flagrant and willful.

545.     The Class has been injured in its business or property in New York by Visa's violations of N.Y. Gen. Bus. Law § 340.

**Count 89: Unlawful Agreements That Restrain Trade in Violation of the New York Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*, (with respect to Class Members' Purchases in New York)**

546.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

547.     In violation of N.Y. Gen. Bus. Law § 340, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in New York and in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

548.     Visa's violations of New York law were flagrant and willful.

549.     The Class has been injured in its business or property in New York by Visa's violations of N.Y. Gen. Bus. Law § 340.

**Count 90: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*, (with respect to Class Members' Purchases in North Carolina)**

550.     Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

551.    In violation of N.C. Gen. Stat. Ann. § 75-2.1, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in North Carolina. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

552.    Visa's violations of North Carolina law were flagrant and willful.

553.    The Class has been injured in its business or property in North Carolina by Visa's violations of N.C. Gen. Stat. Ann. § 75-2.1.

**Count 91: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*, (with respect to Class Members' Purchases in North Carolina)**

554.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

555.    In violation of N.C. Gen. Stat. Ann. § 75-2.1, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in North Carolina. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

556.    Visa's violations of North Carolina law were flagrant and willful.

557.    The Class has been injured in its business or property in North Carolina by Visa's violations of N.C. Gen. Stat. Ann. § 75-2.1.

**Count 92: Unlawful Agreements Not to Compete in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*, (with respect to Class Members' Purchases in North Carolina)**

114

558.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

559.    In violation of N.C. Gen. Stat. Ann. § 75-1, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in North Carolina. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

560.    Visa's violations of North Carolina law were flagrant and willful.

561.    The Class has been injured in its business or property in North Carolina by Visa's violations of N.C. Gen. Stat. Ann. § 75-1.

**Count 93: Unlawful Agreements That Restrain Trade in Violation of Chapter 75 of North Carolina's General Statutes, N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*, (with respect to Class Members' Purchases in North Carolina)**

562.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

563.    In violation of N.C. Gen. Stat. Ann. § 75-1, Visa's agreements with merchatns, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services, and in North Carolina.

564.    Visa's violations of North Carolina law were flagrant and willful.

565.    The Class has been injured in its business or property in North Carolina by Visa's violations of N.C. Gen. Stat. Ann. § 75-1.

**Count 94: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*, (with respect to Class Members' Purchases in North Dakota)**

566.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

567.    In violation of N.D. Cent. Code § 51-08.1-03, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

568.    Visa's violations of North Dakota law were flagrant and willful.

569.    The Class has been injured in its business or property in North Dakota by Visa's violations of N.D. Cent. Code § 51-08.1-03.

**Count 95: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01, *et seq.*, (with respect to Class Members' Purchases in North Dakota)**

570.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

571.    In violation of N.D. Cent. Code § 51-08.1-03, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

116

572.    Visa's violations of North Dakota law were flagrant and willful.

573.    The Class has been injured in its business or property in North Dakota by Visa's

violations of N.D. Cent. Code § 51-08.1-03.

**Count 96: Unlawful Agreements Not to Compete in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01,** *et seq.***, (with respect to Class Members' Purchases in North Dakota)**

574.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

575.    In violation of N.D. Cent. Code § 51-08.1-02, Visa agreed with competitors and

potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably

restrain competition in two relevant markets related to debit transactions in the United States: (1)

the market for general purpose card-not-present debit network services, and (2) the market for

general purpose debit network services.

576.    Visa's violations of North Dakota law were flagrant and willful.

577.    The Class has been injured in its business or property in North Dakota by Visa's

violations of N.D. Cent. Code § 51-08.1-02.

**Count 97: Unlawful Agreements That Restrain Trade in Violation of the North Dakota Uniform State Antitrust Act, N.D. Cent. Code §§ 51-08.1-01,** *et seq.***, (with respect to Class Members' Purchases in North Dakota)**

578.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

579.    In violation of N.D. Cent. Code § 51-08.1-02, Visa's agreements with merchants,

issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services.

117

580.    Visa's violations of North Dakota law were flagrant and willful.

581.    The Class has been injured in its business or property in North Dakota by Visa's

violations of N.D. Cent. Code § 51-08.1-02.

**Count 98: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.*, (with respect to Class Members' Purchases in Oregon)**

582. Plaintiff incorporates by reference each and every allegation contained in the foregoing
       paragraphs.

583.    In violation of Or. Rev. Stat. § 646.730, Visa has willfully and unlawfully

maintained its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein. Visa's acts, individually and collectively, increased,

maintained, or protected its monopoly in both relevant markets.

584.    Visa's violations of Oregon law were flagrant and willful.

585.    The Class has been injured in its business or property in Oregon by Visa's

violations of Or. Rev. Stat. § 646.730.

**Count 99: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.*, (with respect to Class Members' Purchases in Oregon)**

586.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

587.    In violation of Or. Rev. Stat. § 646.730, Visa has attempted to monopolize each of

the relevant markets through the exclusionary course of conduct and anticompetitive acts

described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions

have a cumulative effect that has harmed competition in each relevant market, including raising

118

barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

588.    Visa's violations of Oregon law were flagrant and willful.

589.    The Class has been injured in its business or property in Oregon by Visa's violations of Or. Rev. Stat. § 646.730.

**Count 100: Unlawful Agreements Not to Compete in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.*, (with respect to Class Members' Purchases in Oregon)**

590.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

591.    In violation of Or. Rev. Stat. § 646.725, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

592.    Visa's violations of Oregon law were flagrant and willful.

593.    The Class has been injured in its business or property in Oregon by Visa's violations of Or. Rev. Stat. § 646.725.

**Count 101: Unlawful Agreements That Restrain Trade in Violation of the Oregon Antitrust Act, Or. Rev. Stat. §§ 646.705, *et seq.*, (with respect to Class Members' Purchases in Oregon)**

594.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

595.    In violation of Or. Rev. Stat. § 646.725, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit

119

transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

596.    Visa's violations of Oregon law were flagrant and willful.

597.    The Class has been injured in its business or property in Oregon by Visa's violations of Or. Rev. Stat. § 646.725.

**Count 102: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1,** *et seq.***, (with respect to Class Members' Purchases in Rhode Island)**

598.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

599.    In violation of R.I. Gen. Laws § 6-36-5, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

600.    Visa's violations of Rhode Island law were flagrant and willful.

601.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-5.

**Count 103: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1,** *et seq.***, (with respect to Class Members' Purchases in Rhode Island)**

602.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

603.    In violation of R.I. Gen. Laws § 6-36-5, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts

120

described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

604. Visa's violations of Rhode Island law were flagrant and willful.

605. The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-5.

**Count 104: Unlawful Agreements Not to Compete in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1,** *et seq.***, (with respect to Class Members' Purchases in Rhode Island)**

606. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

607. In violation of R.I. Gen. Laws § 6-36-4, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

608. Visa's violations of Rhode Island law were flagrant and willful.

609. The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-4.

**Count 105: Unlawful Agreements That Restrain Trade in Violation of the Rhode Island Antitrust Act, R.I. Gen. Laws §§ 6-36-1,** *et seq.***, (with respect to Class Members' Purchases in Rhode Island)**

121

610.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

611.    In violation of R.I. Gen. Laws § 6-36-4, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

612.    Visa's violations of Rhode Island law were flagrant and willful.

613.    The Class has been injured in its business or property in Rhode Island by Visa's violations of R.I. Gen. Laws § 6-36-4.

**Count 106: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.*, (with respect to Class Members' Purchases in South Dakota)**

614.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

615.    In violation of S.D. Codified Laws §§ 37-1-3.1, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in South Dakota. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

616.    Visa's violations of South Dakota law were flagrant and willful.

617.    The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1.

**Count 107: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.*, (with respect to Class Members' Purchases in South Dakota)**

122

618.   Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

619.   In violation of S.D. Codified Laws §§ 37-1-3.1, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described, including in South Dakota. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

620.   Visa's violations of South Dakota law were flagrant and willful.

621.   The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1.

**Count 108: Unlawful Agreements Not to Compete in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.*, (with respect to Class Members' Purchases in South Dakota)**

622.   Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

623.   In violation of S.D. Codified Laws §§ 37-1-3.1, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in South Dakota. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

624.   Visa's violations of South Dakota law were flagrant and willful.

625.    The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1.

**Count 109: Unlawful Agreements That Restrain Trade in Violation of the South Dakota Antitrust Statute, S.D. Codified Laws §§ 37-1-3.1, *et seq.*, (with respect to Class Members' Purchases in South Dakota)**

626.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

627.    In violation of S.D. Codified Laws §§ 37-1-3.1, Visa's agreements with merchants, issuers, and acquirers, including in South Dakota, unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

628.    Visa's violations of South Dakota law were flagrant and willful.

629.    The Class has been injured in its business or property in South Dakota by Visa's violations of S.D. Codified Laws §§ 37-1-3.1.

**Count 110: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, (with respect to Class Members' Purchases in Tennessee)**

630.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

631.    In violation of Tenn. Code Ann. § 47-25-102, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

632.    Visa's violations of Tennessee law were flagrant and willful.

124

633.    The Class has been injured in its business or property Tennessee by Visa's violations of Tenn. Code Ann. § 47-25-102.

**Count 111: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, (with respect to Class Members' Purchases in Tennessee)**

634.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

635.    In violation of Tenn. Code Ann. § 47-25-102, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

636.    Visa's violations of Tennessee law were flagrant and willful.

637.    The Class has been injured in its business or property in Tennessee by Visa's violations of Tenn. Code Ann. § 47-25-102.

**Count 112: Unlawful Agreements Not to Compete in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, (with respect to Class Members' Purchases in Tennessee)**

638.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

639.    In violation of Tenn. Code Ann. § 47-25-101, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1)

125

the market for general purpose card-not-present debit network services, and (2) the market for

general purpose debit network services.

640.    Visa's violations of Tennessee law were flagrant and willful.

641.    The Class has been injured in its business or property in Tennessee by Visa's

violations of Tenn. Code Ann. § 47-25-101.

### Count 113: Unlawful Agreements That Restrain Trade in Violation of Tennessee's Trade Practices Act, Tenn. Code Ann. §§ 47-25-101, *et seq.*, (with respect to Class Members' Purchases in Tennessee)

642.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

643.    In violation of Tenn. Code Ann. § 47-25-101, Visa's agreements with merchants,

issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit

transactions in the United States: (1) the market for general purpose card-not-present debit

network services, and (2) the market for general purpose debit network services.

644.    Visa's violations of Tennessee law were flagrant and willful.

645.    The Class has been injured in its business or property in Tennessee by Visa's

violations of Tenn. Code Ann. § 47-25-101.

### Count 114: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.*, (with respect to Class Members' Purchases in Utah)

646.    Plaintiff incorporates by reference each and every allegation contained in the

foregoing paragraphs.

647.    In violation of Utah Code Ann. § 76-10-3104, Visa has willfully and unlawfully

maintained its monopoly in the relevant markets through the exclusionary course of conduct and

anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

648.    Visa's violations of Utah law were flagrant and willful.

649.    The Class has been injured in its business or property Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**Count 115: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.*, (with respect to Class Members' Purchases in Utah)**

650.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

651.    In violation of Utah Code Ann. § 76-10-3104, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

652.    Visa's violations of Utah law were flagrant and willful.

653.    The Class has been injured in its business or property in Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

**Count 116: Unlawful Agreements Not to Compete in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.*, (with respect to Class Members' Purchases in Utah)**

654.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

655.    In violation of Utah Code Ann. § 76-10-3104, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

656.    Visa's violations of Utah law were flagrant and willful.

657.    The Class has been injured in its business or property in Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

### Count 117: Unlawful Agreements That Restrain Trade in Violation of the Utah Antitrust Act, Utah Code Ann. §§ 76-10-3101, *et seq.*, (with respect to Class Members' Purchases in Utah)

658.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

659.    In violation of Utah Code Ann. § 76-10-3104, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

660.    Visa's violations of Utah law were flagrant and willful.

661.    The Class has been injured in its business or property in Utah by Visa's violations of Utah Code Ann. § 76-10-3104.

### Count 118: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*, (with respect to Class Members' Purchases in Vermont)

662.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

128

663.    In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

664.    Visa's violations of Vermont law were flagrant and willful.

665.    The Class has been injured in its business or property Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**Count 119: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451,** *et seq.***, (with respect to Class Members' Purchases in Vermont)**

666.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

667.    In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

668.    Visa's violations of Vermont law were flagrant and willful.

669.    The Class has been injured in its business or property in Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**Count 120: Unlawful Agreements Not to Compete in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451,** *et seq.***, (with respect to Class Members' Purchases in Vermont)**

670.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

671.    In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

672.    Visa's violations of Vermont law were flagrant and willful.

673.    The Class has been injured in its business or property in Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**Count 121: Unlawful Agreements That Restrain Trade in Violation of the Vermont Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*, (with respect to Class Members' Purchases in Vermont)**

674.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

675.    In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

676.    Visa's violations of Vermont law were flagrant and willful.

677.    The Class has been injured in its business or property in Vermont by Visa's violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**Count 122: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the**

**West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, (with respect to Class Members' Purchases in West Virginia)**

678.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

679.    In violation of W.Va. Code § 47-18-4, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in West Virginia. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

680.    Visa's violations of West Virginia law were flagrant and willful.

681.    The Class has been injured in its business or property West Virginia by Visa's violations of W.Va. Code § 47-18-4.

**Count 123: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, (with respect to Class Members' Purchases in West Virginia)**

682.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

683.    In violation of W.Va. Code § 47-18-4, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein, including in West Virginia. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

684.    Visa's violations of West Virginia law were flagrant and willful.

131

685.    The Class has been injured in its business or property in West Virginia by Visa's violations of W.Va. Code § 47-18-4.

**Count 124: Unlawful Agreements Not to Compete in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, (with respect to Class Members' Purchases in West Virginia)**

686.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

687.    In violation of W.Va. Code § 47-18-3, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete, including in West Virginia. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

688.    Visa's violations of West Virginia law were flagrant and willful.

689.    The Class has been injured in its business or property in West Virginia by Visa's violations of W.Va. Code § 47-18-3.

**Count 125: Unlawful Agreements That Restrain Trade in Violation of the West Virginia Antitrust Act, W.Va. Code §§ 47-18-1, *et seq.*, (with respect to Class Members' Purchases in West Virginia)**

690.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

691.    In violation of W.Va. Code § 47-18-3, Visa's agreements with merchants, issuers, and acquirers, including in West Virginia, unreasonably restrain trade in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

692.    Visa's violations of West Virginia law were flagrant and willful.

132

693.    The Class has been injured in its business or property in West Virginia by Visa's violations of W.Va. Code § 47-18-3.

**Count 126: Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, (with respect to Class Members' Purchases in Wisconsin)**

694.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

695.    In violation of Wis. Stat. § 133.03, Visa has willfully and unlawfully maintained its monopoly in the relevant markets through the exclusionary course of conduct and anticompetitive acts described herein. Visa's acts, individually and collectively, increased, maintained, or protected its monopoly in both relevant markets.

696.    Visa's violations of Wisconsin law were flagrant and willful.

697.    The Class has been injured in its business or property Wisconsin by Visa's violations of Wis. Stat. § 133.03.

**Count 127: Attempted Monopolization of the Relevant Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*, (with respect to Class Members' Purchases in Wisconsin)**

698.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

699.    In violation of Wis. Stat. § 133.03, Visa has attempted to monopolize each of the relevant markets through the exclusionary course of conduct and anticompetitive acts described. Each of Visa's acts is anticompetitive in its own right. Collectively, Visa's actions have a cumulative effect that has harmed competition in each relevant market, including raising barriers to competition by current and potential competitors, imposing supracompetitive prices,

stabilizing those prices, limiting price competition, restricting output and other services, and limiting innovation.

700.    Visa's violations of Wisconsin law were flagrant and willful.

701.    The Class has been injured in its business or property in Wisconsin by Visa's violations of Wis. Stat. § 133.03.

**Count 128: Unlawful Agreements Not to Compete in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01,** *et seq.***, (with respect to Class Members' Purchases in Wisconsin)**

702.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

703.    In violation of Wis. Stat. § 133.03, Visa agreed with competitors and potential competitors Apple, PayPal, and Square not to compete. These agreements unreasonably restrain competition in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

704.    Visa's violations of Wisconsin law were flagrant and willful.

705.    The Class has been injured in its business or property in Wisconsin by Visa's violations of Wis. Stat. § 133.03.

**Count 129: Unlawful Agreements That Restrain Trade in Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01,** *et seq.***, (with respect to Class Members' Purchases in Wisconsin)**

706.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs.

707.    In violation of Wis. Stat. § 133.03, Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade in two relevant markets related to debit transactions in

134

the United States: (1) the market for general purpose card-not-present debit network services, and (2) the market for general purpose debit network services.

708.    Visa's violations of Wisconsin law were flagrant and willful.

709.    The Class has been injured in its business or property in Vermont by Visa's violations of Wis. Stat. § 133.03.

## XIV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment in its favor and against Defendants and for the following relief:

A. That the Court certify this case as a class action and that it appoint Plaintiff as class representative and its counsel as class counsel;

B. That the court declare, adjudge and decree that Visa has committed the violations of the laws alleged herein;

C. That the Court award Plaintiff and the proposed classes all appropriate monetary relief, whether by way of restitution or damages, including treble damages, or other multiple or punitive damages, or restitution, where mandated by law or equity or as otherwise available; together with recovery of the costs of suit, to include reasonable attorneys' fees, costs, and expenses, together with pre- and post-judgment interest to the maximum levels permitted by law or equity;

D. That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices;

E. That the Court order such other and further relief as the Court may deem just and proper.

## XV.    JURY DEMAND

Plaintiffs demand a trial by jury of all the claims asserted in this Complaint so triable.

Dated: October 1, 2024                                Respectfully submitted,


                                                      By: */s/ Brent W. Johnson*
                                                      Brent W. Johnson (Attorney Bar Code 4955745)
                                                      Benjamin D. Brown (*pro hac vice forthcoming*)
                                                      Daniel McCuaig (*pro hac vice forthcoming*)
                                                      Zachary Krowitz (*pro hac vice forthcoming*)
                                                      **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                                      1100 New York Ave. NW ● Fifth Floor
                                                      Washington, DC 20005
                                                      (202) 408-4600
                                                      bbrown@cohenmilstein.com
                                                      bjohnson@cohenmilstein.com
                                                      dmccuaig@cohenmilstein.com
                                                      zkrowitz@cohenmilstein.com

                                                      Manuel J. Dominguez (*pro hac vice forthcoming*)
                                                      **COHEN MILSTEIN SELLERS & TOLL PLLC**
                                                      2925 PGA Blvd. ● Suite 200
                                                      Palm Beach Gardens, FL 33410
                                                      (561) 515-2604
                                                      jdominguez@cohenmilstein.com

                                                      Christopher J. Bateman (Attorney Bar Code 3037)
                                                      Daniel Gifford (*pro hac vice forthcoming*)
                                                      **Cohen Milstein Sellers & Toll PLLC**
                                                      88 Pine St. ● Fourteenth Floor
                                                      New York, NY 10005
                                                      (212) 838-7797
                                                      cbateman@cohenmilstein.com
                                                      dgifford@cohenmilstein.com

                                                      *Counsel for Plaintiff All Wrapped Up and Proposed*
                                                      *Co-Lead Counsel for the Class*